**ANTHONY P. MILLER, INC.,**

v.

**The UNITED STATES.**

**No. 464–61.**

United States Court of Claims.

July 16, 1965.

Paul M. Rhodes, Washington, D. C., for plaintiff.

Gerson B. Kramer, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

Plaintiff contracted with the Department of the Air Force to construct 290 family housing units at Niagara Falls Municipal Airport, Niagara Falls, New York. The amount of the contract, as originally executed, was $4,762,000 or about $16,420 per unit. The amount was later increased by a supplemental agreement to $4,784,985 or $16,499 per unit. During the course of construction there arose certain controversies, which produced this action involving nine separate claims in the aggregate amount of about $550,000.

All of plaintiff's claims, except those alleged in Counts VI and IX of the petition, were denied by the contracting officer and duly appealed to the ASBCA.[1] As to several of the claims, the Board found that plaintiff was entitled to additional compensation. However, payment of the claims was withheld since the Secretary of the Air Force had directed that, where such payments would exceed the statutory mortgage limitation, the

1. Under the Disputes clause of the contract (paragraph 8 of the General Provisions), the contracting agency is precluded from paying claims in excess of the "maximum amount payable from mortgage proceeds". In his written memorandum of November 30, 1959, the Assistant Secretary of the Air Force advised the Air Force Panel of the Armed Services Board of Contract Appeals that this clause should not prevent the Board from making a decision on the merits of the case regardless of the amount of the claim in relation to the amount of the mortgage proceeds. He further advised the Board that in the event the payment of the claim would cause the contractor's compensation to exceed the $16,500 statutory limitation, the question of the availability of appropriated funds to pay the claim would be presented to the Comptroller General. This procedure was followed in all the appeals considered by the Board prior to the adverse decision of the Comptroller General, issued May 3, 1961. In the Capehart contracts executed after June 30, 1959, the Disputes clause did not deprive the ASBCA of the authority to approve claims which would cause the contractor to be paid an amount in excess of the mortgage proceeds. By memorandum of January 4, 1961, the Assistant Secretary of the Army advised the Army Panel of the ASBCA that it should consider all pending appeals as if the contract contained the amended Disputes clause. His memorandum further stated that as to future claims, the contracting officer was authorized to amend the Disputes clause and to make decisions on the contractor's claims that would be reviewable by the Army Panel. This administrative action reflects the initial uncertainty about the use of appropriated funds (discussed in detail *infra*) and was intended to defer payment of amounts found to be due the contractor until the Comptroller General gave his approval. There is no indication that the original Disputes clause was intended to limit the authority of the administrative agency concerned, except for such limitations as were determined to inhere in the Capehart Act itself as a matter of law.

question should be referred to the Comptroller General for decision. In his decision of May 3, 1961, the Comptroller General ruled that there was no proper basis on which he could authorize the use of appropriated funds to augment the proceeds of the mortgage in a case where to do so would exceed an average of $16,500 per unit. Following that decision, the Board dismissed the remaining claims pending before it with the notation that plaintiff had exhausted its administrative remedies and that it would be unnecessary for plaintiff to continue proceedings before the Board.

The family housing with which we are concerned here was constructed under the authority of the Capehart Act, as amended, 12 U.S.C. §§ 1748–1748g; 42 U.S.C. §§ 1594–1594f, which had its inception in Title IV of the Housing Amendments of 1955, 69 Stat. 646.

The major issue presented for our determination arises from defendant's contention in its motion for summary judgment that the Capehart Act at 12 U.S.C. § 1748b(b) (3) (B) fixes a limit of $16,500 on the average per unit cost of the housing and thereby precludes a contractor from recovering anything in excess of that limitation. Since all but $15 of the maximum amount of the insurable mortgage has been expended, defendant maintains that the claims now before the court are, for all practical purposes, barred. Relying upon this principal defense, defendant has addressed itself only in the most general terms to the individual claims presented in plaintiff's petition.

Plaintiff has moved for summary judgment on four of the claims included in its petition and, in response to defendant's basic defense, asserts that the provisions of the Capehart Act prescribing the maximum mortgage obligation were not intended to and do not bar recovery by plaintiff on any of its claims.

The details involved in a Capehart Act procurement have been described fully in this court's decision in Anthony P. Miller, Inc., v. United States [No. 3–62] 161 Ct.Cl. 455 (1963), cert. denied 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963).

In summary, the purpose of the Act is to provide adequate and inexpensive housing for members of the Armed Services and their families on military bases without resorting to the more cumbersome procedure of direct annual appropriations. The successful bidder forms a corporation (or corporations) which leases the land from the government and arranges with a financial institution to finance the project by a 100-percent mortgage, which is insured by the Federal Housing Administration. Upon completion of the project and after payment of the loan proceeds to the contractor, the stock of the corporations is transferred to the United States and the loan is amortized through moneys appropriated to pay the housing allowances of personnel who are assigned quarters on the project.

The mortgage insurance provisions of the Capehart Act are found in Section 401 of Title IV of the Housing Amendments of 1955, 69 Stat. 646, and were amended by Section 505 of the Housing Act of 1956, 70 Stat. 1109. These provisions, as codified in 12 U.S.C. § 1748b (b) (3) (B), provide in pertinent part as follows:

(b) *Eligibility for insurance.*

To be eligible for insurance under this subchapter a mortgage shall meet the following conditions:

\* \* \* \* \* \*

(3) The mortgage shall involve a principal obligation in an amount—

\* \* \* \* \* \*

(B) not to exceed an average of $16,500 per family unit for such part of such property or project (including ranges, refrigerators, shades, screens, and fixtures) as may be attributable to dwelling use: *Provided,* That the replacement cost of the property or project as determined by the Commissioner, including the estimated value of any usable utilities within the boundaries of the property or project where

owned by the United States and not provided for out of the proceeds of the mortgage, shall not exceed an average of $16,500 per family unit: *Provided further,* That should the financing of housing to be constructed pursuant to a single invitation for bids be accomplished by two or more mortgages, the principal obligation of any single mortgage may exceed an average of $16,500 per family unit if the sum of the principal obligations of all mortgages for such housing does not exceed an average of $16,500 per family unit: * * *.

In order to resolve the issues before us, the above-quoted language must be considered in connection with those provisions of the Capehart Act which relate to the operation and administration of the military housing program by the Secretary of Defense or his designee and authorize the use of appropriated funds for such purposes. Such provisions were enacted as Sections 403–409, Title IV of the Housing Amendments of 1955, and were not made a part of revised Title VIII of the National Housing Act. The sections that are material to this case appear in 42 U.S.C. §§ 1594a(g) and 1594b, 1594d. The language of these sections confers broad authority with respect to the use of appropriated funds. Section 1594a(a) authorizes the Secretary of Defense to purchase housing financed with mortgages insured under the Act. Sections 1594b and 1594d provide as follows:

§ 1594b. *Maintenance and operation of housing; use of quarters; payment of principal, interest, and other obligations.*

The Secretary of Defense or his designee is authorized to maintain and operate any housing acquired under this subchapter and assign quarters therein to military and civilian personnel and their dependents. Appropriations for quarters allowances or appropriate allotments, and rental charges to civilian personnel, may be utilized by the military department concerned for the payment of principal, interest, and other obligations, except those of maintenance and operation, of the mortgagor corporation with respect to such housing projects. Such payments shall not exceed an average of $90 a month per housing unit and total payments for all housing so acquired shall not exceed $21,000,000 per month: *Provided,* That, in case of the United States Coast Guard, total payments for all housing so acquired shall not exceed $90,000 per month.

\* \* \* \* \* \*

§ 1594d. *Appropriations; use of quarters allowances.*

(a) There are authorized to be appropriated such sums as may be necessary to carry out the provisions of sections 1594–1594c of this title.

(b) Any funds heretofore or hereafter authorized to be expended by any of the military departments or the Coast Guard for the payment of allowances for quarters for military personnel may be used for the purposes specified in subsection (a) of this section.

Since the defendant's position is largely predicated on its reading of the legislative history of the Capehart Act, we direct attention to this court's decision in G. L. Christian and Associates v. United States, 312 F.2d 418, 160 Ct.Cl. 1, rehearing denied, 320 F.2d 345, 160 Ct.Cl. 58 (1963), cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314. In that case the court held that where a Capehart contract was terminated for the convenience of the government, appropriated funds (as contrasted with mortgage proceeds) were available to pay termination costs. Although the court was not then confronted with the issues presented here, the following quotation from the court's opinion is relevant to the interpretation of the Capehart Act and its application to the claims involved in this action:

* * * But the Regulations do not intimate that contracts which ob-

ligate the United States, and create a debt of the United States upon which suit is and can be brought, are also excluded simply because the use or obligation of appropriated funds is delayed and to some extent contingent. There is no doubt that the contract in this case bound the United States and that appropriated funds are importantly involved. The contractor and subcontractors did not hesitate to consider the United States, which of course pays through appropriated funds, liable for the cancellation of the contract. Large sums of appropriated monies were accepted after administrative settlement, and suit is now brought in a court whose judgments are payable through appropriated funds. It would be extraordinary, we think, if an agreement for the breach of which the United States must pay through appropriations was not deemed to obligate such funds.

The Congressional authorization for the contract, i. e., the Capehart Act itself, recognizes affirmatively that appropriated funds will be involved. \* \* \* The Congress which passed the Capehart Act understood that in the long run the housing contracts thereunder could and would "obligate appropriated funds."

We have again reviewed the legislative material on the enactment of the Capehart Act, and its subsequent amendment, together with the reports of the investigations made regarding the administration of the program.[2] We agree with the defendant that the mortgage provisions of the Act impose a limitation on the total cost of the project that may be paid from the proceeds of the insured mortgage. However, we find nothing in the legislative history or in the terms or pattern of the Act indicating that appropriated funds may not be used to pay any claim asserted by a contractor, if the payment will cause the cost of the housing to exceed the authorized mortgage insurance. Concededly, Congress did not, in specific terms, provide that a contractor may be reimbursed for expenses incurred (in excess of the mortgage proceeds) for additional work caused by errors or defects in the government's plans and specifications or required by changed conditions encountered in the performance of the contract. Nevertheless, we find it difficult to conclude that Congress meant that the contractor would remain without a remedy in all such cases. Therefore, we will not attribute to Congress an intention that would produce an impractical, unjust, and unworkable result unless that intention appears clearly on the face of the statute or in the supporting record.

To adopt the government's interpretation would lead to absurd results. Aside from the basic unfairness to the contractor, situations might arise in which the government would be placed in a very difficult position. For example, let us assume that a Capehart contract has been let in which the gross price is very close to the mortgage insurance limit. During construction, a major error in the plans is discovered. It becomes apparent that the expenditure of a sum considerably in excess of the amount of the insured mortgage will be required to complete the construction. If, in such a situation, the government has to close down the project while it seeks an additional appropriation from Congress, the resulting delay could create a serious hazard to the partially completed houses.

---

2. See Hearings, Senate Committee on Banking and Currency, 84th Cong., 1st Sess., on S. 789 and other bills; S.Rep. No. 404, 84th Cong., 1st Sess.; H.R.Rep. No. 913, 84th Cong., 1st Sess.; H.R.Rep. No. 1622, 84th Cong., 1st Sess.; Hearings, House Committee on Banking and Currency, 84th Cong., 2d Sess., on H.R. Rep. 10157; Rep.No. 2005, 84th Cong., 2d Sess.; H.R.Rep.No. 2363, 84th Cong., 2d Sess.; H.R.Rep.No. 2958, 84th Cong., 2d Sess., U.S.Code Cong. and Adm.News 1956, p. 4509; S.Rep.No. 231, 85th Cong., 1st Sess.; 101 Cong.Rec. 7724.

We do not decide that the remedies available to a Capehart Act contractor are equivalent in all respects to those afforded to a contractor in a lump-sum contract payable from appropriated funds. However, and as stated in G. L. Christian and Associates, supra, we believe that Congress understood that the housing contracts would obligate appropriated funds for the payment of meritorious claims of contractors under some circumstances, which we shall hereafter outline in our general conclusions.

As the second point advanced in support of its motion, defendant argues that the agencies entrusted with the administration of the Capehart Act have uniformly and consistently interpreted the mortgage insurance provisions as a limitation which prohibits any administrative action that would increase the contract price in excess of $16,500 per unit. Upon the record before us, we are unable to agree that the executive agencies concerned have taken a consistent position on the availability of appropriated funds to pay claims asserted by contractors.

In a memorandum of November 30, 1959, from the Assistant Secretary of the Air Force to the Chairman of the Air Force Panel, [Armed Services] Board of Contract Appeals, the Assistant Secretary stated:

Where payment of the claim would cause the builder's total compensation to exceed the $16,500 statutory mortgage limitation, it is uncertain whether appropriated funds may be used to pay the excess.

By letter of March 9, 1961, the Deputy Special Assistant for Installations of the Air Force requested a decision by the Comptroller General concerning the use of appropriated funds to pay certain of plaintiff's claims that arose under the housing construction contract in this case. In that letter a strong argument in favor of plaintiff's position was advanced and was quoted in the following portion of the Comptroller General's decision of May 3, 1961:

In support of the view that appropriated funds may properly be used to pay the instant and similar claims the Deputy Special Assistant for Installations refers to that part of the National Housing Act which contains the limitation on the principal amount of the mortgage and states that:

"With the exception of its final proviso, which directly limits the cost of individual family units, this Section of the National Housing Act is, on its face, simply a limitation on the dollar amount of the mortgage loans used to finance the construction of Capehart projects. Since the compensation of a contractor who builds a Capehart project normally comes solely from mortgage proceeds, the limitation on the mortgage has the practical effect of limiting the cost of the housing itself. (In the legislative history of the statute, indeed, the per-unit dollar limitation is sometimes referred to as a 'cost' limitation—see, for example, Senate Report No. 2005, p. 30; House Report No. 2363, p. 40; and House Report No. 2958, p. 28, all of which were issued during the second session of the 84th Congress in connection with the Housing Act of 1956.)"

He then refers to section 407 of Title IV of the Housing Amendments of 1955 and states that:

"*  *  * The statute fails to specify clearly the situations in which appropriated funds may or may not be used under Section 407, and it is this circumstance which gives rise to our present uncertainty. The over-all statutory scheme does suggest to us, however, that Congress expected the military to design projects that a builder could reasonably plan to construct for an amount within the statutory mortgage limit; to award contracts in an amount not exceeding that limit; to arrange for the builder to be paid from mortgage proceeds; and to pay valid claims under the contract with appropriated funds

if mortgage proceeds should subsequently become unavailable for some reason. If this analysis is correct, it may not be without significance that the statute itself makes the $16,500 limitation applicable only to the mortgage and not to the appropriated funds available under Section 407.

"It is our belief that Congress might well have intended the authority contained in Section 407 to be exercised in a situation such as this to satisfy the eligible builder's claims from appropriated funds, notwithstanding the fact that additional mortgage money could not have been borrowed for this purpose without exceeding the statutory mortgage limit. Had Congress intended the limitation on the size of the mortgage to govern the use of appropriated funds in cases like these, it would have been a simple matter to provide in the statute that the total amount of mortgage proceeds and appropriated funds paid to any eligible builder in respect of a single project should not exceed an average of $16,500 per unit; and had Congress intended that the eligible builder always be paid solely from mortgage proceeds (the builder's total compensation thereby automatically being limited by the mortgage ceiling), Section 407 could simply have been omitted. The fact that the statute does authorize the use of appropriated funds and does not expressly limit the expenditure of such funds in the way that the mortgage itself is limited strongly suggests to us that special circumstances might warrant payment of an eligible builder from appropriated funds in an amount over and above the maximum insurable mortgage amount. If we are correct in so thinking, we have no doubt that payment of the amounts to which Anthony P. Miller has been found to be entitled in the instant cases would be justified."

On September 23, 1961, after the issuance of the Comptroller General's decision, the Assistant Secretary of the Navy made the following observation in a memorandum for the Chairman of the Navy Panel, Armed Services Board of Contract Appeals:

4. On the basis of informal rulings of the Comptroller General, the Military Departments have been authorized to utilize appropriated funds (Pay and Allowances) to pay meritorious claims arising under Capehart Housing Contracts.

However, in his Decision B–145318 of 3 May 1961 to the Secretary of the Air Force, the Comptroller General has ruled that there is "no proper basis on which we could authorize the use of appropriated funds to augment the proceeds of the mortgage in a case where to do so would exceed an average of $16,500 per unit".

The quoted statement indicates that one of the military departments viewed the Comptroller General's decision of May 3, 1961, as a departure from a position previously taken.

While we do not rest our decision solely on the basis of any of the administrative interpretations referred to above, we find in them support for our conclusions.

In its third argument, defendant maintains that the mortgage insurance provisions of the Capehart Act constitute a limit or a condition upon the use of funds appropriated for the housing program and, therefore, that the government is not liable for any costs in excess of that statutory limit. Defendant cites Sutton v. United States, 256 U.S. 575, 41 S.Ct. 513, 65 L.Ed. 1099 (1921); Curtis v. United States, 2 Ct.Cl. 144 (1866), and Shipman v. United States, 18 Ct.Cl. 138 (1883), but we do not believe that those decisions are dispositive of the case at bar. They involve the interpretation of particular appropria-

tion acts which bear little resemblance to the provisions of the Capehart Act.[3]

## GENERAL CONCLUSIONS

■■ Based on our review of the legislative history, we agree with defendant that in enacting the provisions of the Capehart Act that limit the amount of mortgage insurance, Congress was primarily interested in avoiding the windfall profits which had inured to some contractors under prior housing programs and in preventing the military from constructing elaborate and expensive quarters.[4] Consequently, we believe that the intention of Congress would be frustrated if a contractor is permitted to recover for simple extras, the payment for which will cause the cost of the project to exceed the maximum amount of the insured mortgage. To hold otherwise, would open the door to evasion of the statutory mortgage limit by collusive action of the contracting officer and the contractor, or by the unilateral action of the contracting officer and the cooperation of a willing contractor. In order to prevent an accidental over-obligation of funds, the contractor should, before performing the extra work, insist on a formal written commitment by the FHA Commissioner that the extra will not cause the total contract cost to exceed the mortgage limitation—all as provided in paragraph 9 of the General Conditions of the contract. The contractor knows the amount that has been expended and the total amount of the insurable mortgage. He should at all times be wary of the limit. We realize that this adherence to formalities places more than normal responsibility on the contractor, but we think it is required by the Capehart Act.

■ To be contrasted with simple extras are claims that arise because of work that is necessitated by the government's defective plans or specifications, and claims that fall within the terms of the Changed Conditions clause of the contract. As long as the additional work is required as a result of either of these situations, it is our opinion that the contractor is entitled to recover, even though the result is to increase the cost of the contract above the amount of the insured mortgage.

■ A somewhat more difficult situation arises when the claim results from ambiguous specifications and the insistence of the contracting officer upon the installation of a more expensive item than the contractor believes to be required by the specifications. Since this is potentially an area for abuse, the contractor's compliance should be made under protest. If that is done, the contractor would be entitled to recover without regard to the mortgage insurance limitation, unless it is shown that the contracting officer has, in bad faith, ordered the installation of a more elaborate and expensive item than is specified in the contract and that fact is known to the contractor.

Although we have undertaken to provide general guidelines for the disposition of some of the claims included in plaintiff's petition, we do not at this time decide whether plaintiff is entitled to recover on any of its claims, except those which are included in its motion for partial summary judgment and are discussed below. Since the remaining claims must be remanded to the trial commissioner for further proceedings, the parties will have an opportunity to brief the issues raised in those claims. Such briefs may, if consonant with this opinion, include arguments on the effect of the mortgage insurance limitation provision of the Capehart Act on all of plaintiff's claims except those alleged in Counts I, II, III, and VI of the petition.

---

3. These cases are to be contrasted with Joplin v. United States, 89 Ct.Cl. 345 (1939) and Lovett v. United States, 66 F.Supp. 142, 104 Ct.Cl. 557 (1945), aff'd on other grounds, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946).

4. This concern is reflected in the detailed space limitations applicable to military housing, 42 U.S.C. § 1594f; 10 U.S.C. §§ 4774, 7574, 9774.

## Count I—Attic Water Pipes

As alleged in Count I of the petition, plaintiff filed a claim with the contracting officer for $3,545.57, the additional costs that were incurred in repairing damage caused by the freezing and breaking of water pipes in the attics of the houses. The claim was denied, but the ASBCA sustained the appeal in a decision holding that the damage occurred by reason of defective government specifications. The claim was not paid but processed in accordance with the memorandum issued by the Assistant Secretary of the Air Force on November 30, 1959. In accordance with that memorandum, this and other claims considered by the Board were presented to the Comptroller General to determine whether appropriated funds could be used in payment of the claim. As previously stated, the Comptroller General held that the agency was not authorized to use appropriated funds for payment of the claim.

From the discussion set forth in our General Conclusions, it follows that plaintiff is entitled to prevail on this claim. Accordingly, as to Count I, defendant's motion is denied and plaintiff's motion for summary judgment is granted in the sum of $3,545.57. The entry of judgment will be suspended pending the entry of a judgment on the other claims involved in plaintiff's petition.

## Count II—Grade Elevations

As shown in Count II of the petition, plaintiff claimed that the actual grade elevations on the project site were 6 inches lower than as shown on the contract drawings. Nevertheless, plaintiff was required to attain the finished grades in accordance with the true ground elevations and this necessitated the placement of approximately 27,633 cubic yards of additional fill. Although the contracting officer denied the claim, the ASBCA sustained the appeal by finding that the additional fill was required by reason of errors in the contract drawings. However, the Board held that roughly one-half of the 6-inch variance represented an acceptable or normal tolerance. It ruled that plaintiff was entitled to be compensated for only one-half of the additional fill placed. As a result of the adverse ruling by the Comptroller General (referred to in the discussion of Count I above), plaintiff has not been paid for any of the additional work.

With respect to the claim set forth in Count II, defendant's motion is denied and plaintiff's motion is granted to the extent that plaintiff's right to recover is not precluded by the provisions of the Capehart Act. However, since plaintiff has challenged the Board's decision on the grounds that it is not supported by substantial evidence and is erroneous as a matter of law, the claim is remanded to the trial commissioner for review of the Board's decision under the standards set forth in the Wunderlich Act and for a determination of the amount plaintiff is entitled to recover.

## Count III—Electrical Fixtures

This claim, as shown in Count III of the petition, is for the additional cost of electrical fixtures which were installed in the dwellings by plaintiff under protest. The contractor and contracting officer disagreed as to what type of light fixtures were required by the contract. The latter insisted on the installation of a model which cost approximately $45 more per unit than the fixture plaintiff planned to install. Upon appeal from the contracting officer's decision, the ASBCA found that there was a discrepancy in the drawings prepared by the government and that such drawings were fairly and reasonably susceptible of the construction placed upon them by plaintiff. Consequently, the Board held that defendant was obligated to bear the additional costs required in the installation of the more expensive fixtures. It is clear from the Board's decision that the contractor protested vigorously and there is no indication that the contracting officer was not acting in good faith. The Board did not make an unqualified determination of the amount due plaintiff

on the claim and no payment was made in view of the adverse decision of the General Accounting Office.

■ In the light of our discussion regarding claims in this category, plaintiff is entitled to recover but the record does not establish the amount for which judgment should be entered. Therefore, defendant's motion as to the claim in Count III is denied; plaintiff's motion is granted on the issues of fact and law relating to plaintiff's right to recover, but the claim is remanded to the trial commissioner for determination as to the amount of the recovery.

### Count VI—Fireproofing of Garage Ceilings

The contracting officer requested plaintiff to submit a proposal for the installation of fire resistant wallboard in the ceilings of the garages. Plaintiff's quotation of $2,135.28 for the cost of this extra work, which was not called for in the contract, was accepted and the additional work performed. Funds were available for the payment of the claim from mortgage proceeds at the time the work was authorized. However, before the formal change order was approved by the FHA Commissioner and issued, all but $15 of the maximum amount of the insurable mortgage had been obligated or expended. The claim was never presented to the ASBCA because no change order had been issued.

The decision on this claim presents a somewhat difficult question because of the fact that the exhaustion of the funds, that would have been available for payment of the claim at the time the work was authorized, resulted from an increase in the insurable mortgage ordered by the FHA Commissioner after plaintiff's quotation had been accepted by the contracting officer. That increase in the mortgage is attacked by plaintiff in Count IV.

■ Notwithstanding the unusual circumstances mentioned, it is undisputed that the contractor proceeded with the installation of an extra without receiving the formal approval required by paragraph 9 of the General Provisions of the contract. As we pointed out in our General Conclusions, the contractor has a responsibility in such circumstances for avoiding an over-obligation of mortgage funds in Capehart Act contracts. Had the change here been processed as required by the terms of the contract, the cost of the extra would have been funded or the extra abandoned. For these reasons, plaintiff's motion with respect to the claim alleged in Count VI is denied; defendant's motion is granted and the petition as to Count VI is dismissed.

### Remaining Claims

With respect to Counts IV, V, VII, VIII, and IX of plaintiff's petition, defendant's motion is denied and the claims are remanded to the trial commissioner for further proceedings not inconsistent with this opinion.