**ANTHONY P. MILLER, INC.**

**v.**

**The UNITED STATES.**

**No. 464–61.**

United States Court of Claims.

March 20, 1970.

Paul M. Rhodes, Washington, D. C., attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on October 7, 1969, wherein such facts as are necessary to the opinion are set forth. Requests for review were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

With respect to Count II, the court emphasizes that its decision is based on the particular evidence in the particular record, and that it is not laying down a rule of law or a rule applicable to all cases of this type. As the trial commissioner shows, the Armed Services Board of Contract Appeals placed its decision on the evidence in the record, but in doing so wholly misconstrued that evidence and, accordingly, made a factual finding not based on substantial evidence. For that reason this administrative determination cannot stand. Whether the same, or a similar, determination could be made upon a different record in another case is not before us.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case. Therefore, as to Count II of the petition plaintiff's motion for summary judgment is granted, defendant's cross-motion denied and judgment is entered for plaintiff in the sum of $60,464.25. As to Count V of the petition plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and the petition is dismissed. The suspension of the entry of judgment for plaintiff on Count I of the petition in the sum of $3,545.57, set forth in our opinion of July 16, 1965 (348 F.2d 475, 484, 172 Ct.Cl. 60, 74), is terminated and judgment is hereby entered for plaintiff accordingly.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner:

Counts II and V of plaintiff's petition are now presented for decision on plaintiff's motion and defendant's cross-motion for summary judgment, with supporting briefs of the parties, in review of decisions of the Armed Services Board of Contract Appeals pursuant to the standards of judicial review prescribed by the Wunderlich Act, 41 U.S.C. §§ 321, 322.

It is my opinion that plaintiff is entitled to recover the sum of $60,464.25 on Count II of the petition, but that plaintiff is not entitled to recover on Count V.

The status of the other counts of plaintiff's petition is as follows: Count I was by the court decided in favor of plaintiff in the sum of $3,545.57, with entry of judgment suspended pending the entry of judgment on the other claims involved in plaintiff's petition, 348 F.2d 475, 484, 172 Ct.Cl. 60, 74. Counts III and VIII have been dismissed upon stipulations of the parties. Count VI was dismissed by the court. 348 F.2d 475, 485, 172 Ct.Cl. 60, 76. Counts IV, VII and IX are being prepared in pretrial procedures for a trial de novo in this court.

Plaintiff contracted with the Department of the Air Force to construct 290 family housing units under the Capehart Housing Act on a 67.5-acre tract at Niagara Falls Municipal Airport, Niagara Falls, New York. The amount of the

contract, as originally executed, was $4,762,000, later increased somewhat by supplemental agreement.

### Count II—Grade Elevations

■ Plaintiff's claim, denied by defendant's contracting officer and duly appealed to the ASBCA, is that the actual grade elevations on the project site were 6 inches lower than as shown on the contract drawings, and that plaintiff was required to attain the finished design grades, which required plaintiff to bring onto the project site and compact an additional 56,132 cubic yards of earth fill.

In its decision, ASBCA No. 5704, 61–1 BCA ¶ 2905, the Board found that "the true mean ground elevation was .48 of a foot below the mean ground elevation delineated on the drawings." The Board further found that plaintiff "was under no duty to make an investigation, prior to performance, to determine whether or not the drawings showed the correct elevations," and further that plaintiff "had every reason to rely on their reasonable correctness."

These basic conclusions of the Board are not assailed in this court, and are held to be final. Under attack by plaintiff is the measure of equitable adjustment prescribed by the Board, as hereinafter related.

The Board did not then determine the amount of recovery, but did decide that additional fill was in fact supplied, and remanded the claim to the contracting officer for initial determination of the quantity and value of the extra fill supplied. Further consideration of the claim by the contracting officer was then aborted by the extant ruling of the Comptroller General against further expenditures in view of the statutory limitation of costs on a Capehart Housing Act project. It was at this stage of administrative proceedings that plaintiff's petition was filed in this court.

The court thereafter held that the statutory limitation was not applicable to subject claim. 172 Ct.Cl. 60, 75, 348 F.2d 475, 484. Thereafter, such claim was by order of a formerly assigned trial commissioner of this court "remanded to the Armed Services Board of Contract Appeals for determination by that Board of (i) the quantities of additional earth spread and compacted, and (ii) the equitable adjustment per cubic yard for the furnishing of that material for the performance of the work."

At a hearing convened thereafter by the Board, it was stipulated by the parties "that the amount of extra fill furnished by appellant was 52,350 cubic yards and that $1.00 per cubic yard plus 10% overhead and 5% profit is an equitable allowance for the costs caused by the extra fill."

Upon recording the stipulation, the Board held that such agreement disposed of the issues on the claim, and dismissed the pertinent appeal.

In its above-cited decision, the Board concluded that "only 50% of the additional fill required should be compensable to the contractor." Plaintiff's arguments before this court are basically an attack upon the finality and validity of this conclusion of the Board. On this issue, the significant part of the Board's decision is as follows:

We find from the evidence before us, considering fully the inexactness of the methods and manners used, that the true mean ground elevation was .48 of a foot below the mean ground elevation delineated on the drawings. This is approximately six inches. However, it does not follow that appellant's complaint or appeal should be sustained to the extent of the .48 of a foot differential because, as stated above, the contractor should have allowed, in the computation of its bid, an acceptable or normal tolerance of approximately three inches. Based on this we determine that the excess of three inches in mean ground elevation represents an error in the drawings. Stated in another way, we find that 50% or a .24 of a foot represents the excess over and above the reasonable tolerance and that the additional

fill needed to meet the .24 of a foot differential is an extra, compensable under the Changes and Changed Conditions clause of the contract. [61–1 BCA, p. 15178]

If the Board's decision is final on the measure of the equitable adjustment, the amount of plaintiff's recovery would be $30,232.13, based upon the stipulation of the parties as applied to one-half of the 52,350 cubic yards of extra fill supplied. No administrative payment has been made. Plaintiff contends that it is entitled to recover $60,464.25, which is the correct sum if the stipulation of the parties is held to be applicable to all of the 52,350 cubic yards of extra fill supplied.

In ruling as it did on the measure of the equitable adjustment, the Board sustained the position of the Government that since the method of computing ground elevations, through the use of contour lines, maps and grid cross-sections, is not an exact mathematical science, the contractor should have allowed in its bid for a reasonable minus or plus interpretation of the elevations depicted. The Board stated that the contractor should not have relied upon the exact depicted elevations as being unalterably true, but concluded that the differential in mean ground elevations as later determined was such as to go beyond any reasonable variance to the parties. Pertinent parts of the Board's decision in explanation of these conclusions are as follows:

It is conceded by both parties that the respective methods (grid cross-sectioning, etc.) used in the computations of the mean elevations were those normally followed and accepted in the profession. The variances between the resultant computations can, in large measure, be accounted for by reason of human error and judgment. The human error factor can be traced from the point of initial preparation of the lay-out to the finished mathematical computations. The use and interpretation of bench marks, the use of optical instruments, the insertion and interpolation of contour lines on

maps, the transposition of the contour lines on the grid cross-sections, the scale of the drawings, the interpolation of those contour lines in relation to their elevations within a given cross-section station and others are all part of the many variables injected in the problem. We find it futile to discuss these variables in detail and shall refer to them only as we deem advisable to our conclusions.

\*    \*    \*    \*    \*    \*

Appellant's testimony confirms the impossibility of determining true grade elevations by any reasonable method used. One-tenth of a foot (or one to two inches) variance or tolerance—plus or minus—is normal in the work involved in preparation of data —lay-out work, grid cross-sections, interpolation, etc. To put it another way, the acceptable tolerance can be within 10 to 15%—plus or minus. The Government's testimony is generally comparable to appellant's as to acceptable tolerances. Such testimony refers to variables of two or three inches—plus or minus—or .28 or .38 feet. Still at another point in the Government's evidence, the acceptable tolerance in relation to true elevation was stated as .16 to .25 feet. The drawings, asserts the Government, were as accurate as could be expected. We agree with the Government that a certain allowance should be made, however, the allowances should not extend beyond reasonably acceptable limits. We must disagree with the Government that the drawings were reasonably accurate within the acceptable limits. The contracting officer admitted on cross-examination that while he determined the drawings were normally accurate, he did not know what the normal degree of accuracy would be. Moreover, the contracting officer did not know the degree of accuracy achieved by the topographical drawings. He relied entirely on his technical advisors that the drawings were reasonably accurate. [61–1 BCA, pp. 15177–78]

The difficulty with the Board's decision on this claim, however, is that the testimony of all of the qualified surveyors before the Board is in agreement that it would be expected that each of the possible errors and variables described by the Board would as likely be on the positive side as on the negative, both in taking measurements at certain locations and in making interpolations therefrom to other locations, and that the probability was that the minus errors would be canceled out by the plus errors in the overall layout. Their testimony was not based merely upon abstract theory, but related to the facts and circumstances pertaining to the project site. The evidence is clear that the site was unimproved farmland, quite flat in its appearance, with a minor uniform grade from one end to the other, with no substantial mounds or depressions, although the *de minimis* problem of ditches was mentioned.

The Government's principal surveying witness relied heavily upon an abstract theory relating to errors in surveying, which he read from an unspecified edition of a Civil Engineering Handbook by Urquhart, as follows:

> The total systematic error in any given number of measurements is the algebraic sum of the individual errors of the individual measurements.

This statement was explained by him to mean that the greatest possible error in surveying was the summation of all errors on the assumption that they were all made in one direction.[1] He conceded that such theory of systematic error contemplated that the plus errors would tend to cancel the minus ones, but that at any given location, it could not be determined whether the error was plus or minus. Relying on this abstract theory, and assuming that all errors were on the minus side, this witness proffered the opinion in effect, or at least strongly inferred, that in this case the contractor should have allowed in his bid for a minus error of .28 to .38 of a foot from the mean average elevation delineated on the bid drawings. However, even this witness recognized that on the subject project, the minus errors would tend to be canceled by the positive ones.

There is no evidence to support the conclusion that under the facts and circumstances of this case, the contractor should have realized that all of the possible errors and variables described by the Board would have been made on the minus side with respect to the mean average elevation delineated on the bid drawings, or even that the minus errors would have overbalanced the positive. The only reasonable conclusion is that plaintiff was entitled to assume that errors inherent in surveying and in the interpolation of surveyed measurements would have been eliminated by counterbalancing and that the elevations delineated on the bid drawings were correct from the standpoint of determination of the mean average elevation represented by such drawings.

It is my conclusion that there is no substantial evidence to support the Board's conclusion that plaintiff in the

---

1. Principles concerning errors in surveying are set forth at pages 1–4 to 1–7 of L. C. Urquhart, Civil Engineering Handbook (4th ed., 1959, McGraw-Hill Book Company, Inc.), where *inter alia* the following definition is presented:

"A *systematic error* is one that, so so long as conditions remain unchanged, always has the same magnitude and the same algebraic sign (which may be either positive or negative). If conditions do not change during a series of measurements, the error is termed a *constant* systematic error; e. g., a line may be measured with a tape that is too short. If conditions change, resulting in corresponding changes in the magnitude of the error, it is termed a *variable* systematic error; e. g., a line may be chained during a period in which the temperature varies. A systematic error always follows some definite mathematical or physical law, and a correction can be determined and applied. The error may be instrumental, personal, or natural. The total systematic error in any given number of measurements is the algebraic sums of the individual errors of the individual measurements."

preparation of its bid estimates should have allowed as a tolerance a minus .24 of a foot on the average mean elevation delineated on the bid drawings, and that judgment should be entered for plaintiff in the sum of $60,464.25 for the full amount of the extra fill supplied.

*Count V—Heat Distribution Systems*

■ The contract plans and specifications provided for the construction on Parcel B of the subject project of 116 dwelling units in 72 buildings without basements, with each building constructed on a 4-inch concrete slab over a 4-inch granular fill. Below each slab were located a furnace plenum chamber and 5 to 7 ceramic ducts leading therefrom. Warm air, supplied by a furnace located above the slab, was forced into the plenum and through the ducts to distribution facilities at the walls and thence to various parts of the building.

During the construction of these units, and near the completion thereof, excessive quantities of water seeped through the concrete block foundations and into the plenums and thence into the ducts. Operation of the furnaces caused warm air to carry moisture from the plenums and ducts, resulting in extensive moisture damages to the interiors of the buildings.

Plaintiff was directed by a change order issued by defendant's contracting officer to waterproof all of the foundation walls of the Parcel B buildings by the penetration parge method. The price quoted by plaintiff and included in the change order was $18,853.48. However, the contracting officer had previously determined that the furnace plenums were improperly installed and had directed plaintiff to remove and replace them. This requirement was deleted by the change order, which provided that the Government was entitled to a credit of $18,853.48 for improper installation of the plenums, thus making the waterproofing a no-cost change, as stated in the change order.

Plaintiff was also required at an alleged cost of $58,000 to resurface and refinish floors, repaint walls and woodwork, and perform other corrective work, made necessary by the presence of water in the heat distribution systems.

Plaintiff's claim of entitlement to the agreed cost of waterproofing and for an equitable adjustment for the corrective work was denied by the contracting officer and duly appealed to the Armed Services Board of Contract Appeals (ASBCA No. 6234).

Plaintiff also duly appealed (ASBCA No. 6483) the contracting officer's determination that the furnace plenums were improperly installed and also his assessment of a credit to the Government of $18,853.48 for that reason.

These appeals were consolidated, a hearing held thereon, a transcript of testimony and proceedings at the hearing filed, and briefs submitted by the parties. At the hearing, the parties agreed that if the appeals were sustained, the Board would decide the amounts of recovery except as to the corrective work on the interiors of the buildings, which would be remanded to the contracting officer for negotiation of an equitable adjustment.

Thereafter the Board announced its decision, 61–1 BCA ¶ 2985, denying the claims. The Board found that the source of the water was from the surface of the ground outside the pertinent buildings, derived from melting snow and ice, that plaintiff's failure to construct the foundation walls efficiently permitted the water to enter the buildings, that on a substantial number of buildings, plaintiff's failure to provide the required 2% slope from the buildings in the placing of top soil and earth fill contributed to entry of the water through the foundations, that the failure of the plaintiff to provide a vapor barrier around each plenum permitted the water to enter the plenums, and that the moisture damage to the interiors of the buildings was caused by the water getting into the heating system in such manner.

There was no contract requirement that the foundation walls be water-

proofed. Each foundation wall had a substantial concrete footing, with two courses of concrete blocks placed thereon, with the blocks joined to each other and to the footing by application of mortar. The outside earth fill was placed at such a level that only the upper course of blocks was exposed at most locations.

The uncontradicted testimony before the Board was that such foundation walls would not be waterproof or watertight, but if properly constructed, would be water-resistant.

Also, the testimony and evidence before the Board was in harmony that the water entered the building through the block foundations. Very substantial amounts of water passing through the foundations found its way into the plenums as evidenced by the large amounts of water pumped therefrom by plaintiff during the pertinent time, with constant pumping required in some locations, with as much as 400 to 500 gallons of water pumped at one location in one day.

Contrary to plaintiff's arguments herein, it is concluded that there was substantial evidence before the Board to support its determination that the water entered the buildings because plaintiff failed to construct the foundation walls efficiently. In the first place, it is reasonably inferrable from the above-stated facts, and there was expert testimony before the Board to that effect, that the water must have entered through defects and voids in the mortar joints as constructed. Sound concrete blocks pass negligible amounts of water, as established by credible testimony. Of course, if the walls had been constructed carefully, and thus were made water-resistant, seepage through the walls was possible to some extent, because water stood outside and near the foundation walls for a substantial period of time. But obviously the quantities of water which entered the foundation walls were so substantial in amount, as to be reasonably explained in terms of defective mortar joints, because such water proceeded through the granular fill, and in spite of retention of water by such fill and any

loss by subsidence into the ground below, entered the plenums in the large quantities indicated by plaintiff's pumping operations.

In addition, there was uncontroverted evidence before the Board that the footings were not cleaned before application of mortar and placement of blocks thereon. One subcontractor constructed the footings, whereas another thereafter installed the blocks. During the interval between the two operations, protective straw was placed on the footing. Pieces of straw and dirt existed on the footings when mortar and blocks were being placed, and this was repeatedly called to plaintiff's attention by the Government inspector. On occasions, Government inspectors observed that dirty water was used in mixing the mortar, and that the mortar was not consistent. The testimony established that when a deficiency in such work was pointed out to the contractor, a correction was made, but such evidence does not reasonably compel the drawing of an inference that plaintiff's construction of the foundation walls was without the deficiencies found by the Board, or preclude the finding that deficiencies did in fact exist. In fact, one foundation wall was completely redone because of presence of straw in the mortar to the extent that bonding had not been accomplished, indicating that an inspector was not present at all locations and at all times.

With respect to the Board's determination that plaintiff improperly installed the furnace plenums, the Board reached the undisputed conclusion that the contract plans and specifications did not detail the manner of construction of the plenum chambers. Having a choice of several types, plaintiff submitted to the contracting officer for consideration and approval the type of duct proposed to be installed, having the trade name of Ceramiduct, together with a brochure of the manufacturer, carrying notes as to installation of both the ducts and the plenums. The Ceramiduct system was approved by the contracting officer by endorsement on the brochure. The bro-

chure referred to round factory-built plenums, whereas plaintiff installed poured-in-place concrete plenums, a practice followed in the construction industry in a great majority of cases involving heat distribution systems like subject project. In fact, the testimony was uncontradicted that factory-built plenums were not adaptable to subject project, and that poured-in-place plenums were necessary. The manufacturer's installation notes called for a vapor barrier around each duct and also around each plenum.

The Board found that plaintiff's failure to install the vapor barrier around the plenums was a deviation from the brochure instructions, approved by the contracting officer, relying on testimony of a representative of the manufacturer of Ceramiduct, called as a witness by plaintiff before the Board, that he was present during the initial construction and installation of the plenum chambers and duct runs in the first twelve units, and that he thought a vapor barrier had been used around the plenum chamber as called for in the brochure, and that the recommended use of a vapor barrier applied equally to a poured-in-place plenum.

The plenums and ducts themselves were not designed nor intended to be water-tight, nor could they reasonably have been made so, as established by the testimony and evidence before the Board. In the installation of the ducts, plaintiff did provide a vapor barrier between the granular fill and each duct, but not between each plenum and the granular fill. A vapor barrier is a membrane separating one substance from another, substantially eliminating penetration of moisture between the separated materials. The lack of a vapor barrier about the plenums afforded ready penetration of water into the plenums and into the ducts, at the locations where the ducts joined to the plenum. The Board's statement is unchallenged that even grouting of such joints would not have made the plenums waterproof, and in any event such joints were not grouted.

In view of the Board's determinations that the causes of the water condition were the deficient and defective installation of the mortar joints in the foundation walls and the failure of plaintiff to provide a vapor barrier around each of the plenums, which determinations are found to be supported by substantial evidence, it is concluded that the Board reasonably rejected plaintiff's contentions and testimony and evidence adduced in support thereof, that the contract drawings were deficient in design in requiring that the pertinent ducts be placed below the concrete slabs at an elevation below that of the finished grade of the ground outside the foundation walls, and that these claimed deficiencies were the cause of the water condition. Since the testimony and evidence were in conflict as to whether the design was deficient in these respects, and also as to whether such design was a causative factor, it is concluded that the Board's determinations should be sustained by this court. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966).

■ Plaintiff complains that the Board "alluded to an alleged failure by the contractor to perform the finish grading properly as being a contributing cause" to the passage of water through the foundation walls. Before the Board, and in this court, plaintiff's position is that there was a basic design deficiency with respect to Parcel B of the project in that the designated elevations of the streets and many of the buildings, and the driveways leading downward to the building from the curb elevation, made it impossible to achieve a 2% slope away from some of the buildings. A considerable number of the contract drawings delineated a 2% minimum slope of the finish grade away from the buildings. Because the design grade sloped from the street level to buildings in a number of instances, it was impossible to provide a continuous 2% slope from the sides of various buildings all the way to

the street level. However, the 2% slope from the sides of such buildings could be reasonably accomplished by the use of swales, depressions or valleys between opposing slopes. The contract drawings depicted major swales. Plaintiff constructed the swales where shown, but not otherwise. The testimony is uncontradicted that it was good practice to provide the 2% slope at all locations, that minor swales are not usually shown on drawings, that the contractor normally constructs the minor swales on his own initiative as part of achieving proper drainage on the design grades, as called for by the specifications, and that by use of swales such a slope could have been reasonably provided around all of the subject buildings.

The Board reasonably concluded that a 2% slope from all buildings was expected and intended under the contract, and that the contract plans were not deficient in that respect. The Board properly relied upon trade practice in the interpretation of the contract drawings, and its ruling was reasonable and correct as a matter of law. Gholson, Byars & Holmes Const. Co. v. United States, 351 F.2d 987, 999–1000, 173 Ct.Cl. 374, 395–396 (1965).

Obviously, there was substantial evidence to support the Board's determination that lack of 2% slopes contributed to the passage of water through the foundation walls, in spite of the fact that water in substantial quantities passed through the foundations of buildings, where such slopes had been provided. In fact, the passage of water in cases where such slopes did exist lends weight to the conclusion that defective mortar joints were the principal cause.

The contracting officer testified before the Board that engineering estimates and reports supplied to him showed that the plenums could not have been removed and reinstalled for less than the agreed cost of waterproofing the foundations. Plaintiff's evidence to the contrary was at best superficial and lacking in sufficient detail to be reliable. A description of the work that would have been required is detailed in testimony before the Board, and obviously such work would have been very expensive, with the buildings near completion, and with the furnaces installed over the plenums.

In summary of its disposition of all claims relating to the water condition, the Board stated as follows:

We reiterate therefore that the responsibility for correcting the water condition (including drainage and deficiencies in the plenum chambers and foundation walls) was appellant's and its responsibility entails the correction of the damages flowing therefrom. [61–1 BCA, p. 15506]

Plaintiff presents no argument or contention that the Board erred in failing to find expressly what the costs of correction of the plenums would have been. In any event, the Board should be sustained in its holding that plaintiff was responsible for the agreed costs of correction of the deficiencies in the foundation walls and any costs of correction of the moisture damages to the interiors of the buildings, and thus the question of the costs which would have been incurred in removal and replacement of the plenums becomes irrelevant.

## CONCLUSION

Upon the basis of the foregoing opinion which is adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff's motion for summary judgment is granted as to Count II of the petition, that defendant's cross-motion for summary judgment is denied as to such count, and that judgment is entered for plaintiff in the sum of $60,464.25 on such count; and further that plaintiff's motion for summary judgment is denied as to Count V of the petition, that defendant's cross-motion for summary judgment is granted as to such count, and that the petition is dismissed as to such count.

The suspension of the entry of judgment for plaintiff on Count I of the pe-

tition in the sum of $3,545.57, set forth in our opinion of July 16, 1965 (348 F. 2d at 484, 172 Ct.Cl. at 74), is terminated and judgment is hereby entered for plaintiff accordingly.