**ALFRED A. ALTIMONT, INC.**

v.

**The UNITED STATES.**

No. 291–77.

United States Court of Claims.

July 14, 1978.

George W. Shaffer, Rockville, Md., attorney of record, for plaintiff.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, KUNZIG and BENNETT, Judges.

## ON PLAINTIFFS'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case comes before the court on defendant's motion, filed March 23, 1978, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge John P. Wiese, filed February 10, 1978, pursuant to Rule 166(c) on the parties' cross-motions for summary judgment, plaintiff having failed to file a request for review thereof by the court and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby grants defendant's motion and adopts the decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff is not entitled to recover and, accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and plaintiff's petition is dismissed.

### OPINION OF TRIAL JUDGE

WEISE, Trial Judge: Following trial proceedings below, the Department of Transportation Contract Appeals Board (the board) entered a decision denying appellant (the contractor and plaintiff here) an equitable adjustment in contract price for work performed at the Government's insistence which the contractor had contended represented added effort not otherwise called for under a reasonable interpretation of the relevant contract drawing. The board held that the contractor's evaluation of the expected scope of work rested on an erroneous and unreasonable interpretation of the contract that was reinforced by an inadequate site inspection. The matter is now before the court for review under the standards of the Wunderlich Act, 41 U.S.C. §§ 321–22.[1] We agree with the board's results.

### I. Facts

The subject of plaintiff's competitively-awarded construction contract was the permanent repair of certain structural damage that had occurred in one of the buildings at the Dulles International Airport when settlement of the building caused the rupture of a water main. The released water flowed between the floor slab and the ground floor resulting in the buckling, crushing, and uplifting of both the polished aggregate topping slab that was located in

---

1. The proceedings below were docketed as appeals of *Alfred A. Altimont, Inc.*, DOTCAB Nos. 70–15, 70–15A, 72–1 BCA ¶ 9260. In the instant case, the court has before it only Counts 1 and 2 of No. 70–15. All other matters that had been before the board were there dismissed with prejudice upon motion of the parties.

a concourse area (a pedestrian walkway) and the hardrock concrete topping slab that was located in an immediately adjacent area. In the contract drawing which detailed the scope of work (Drawing DR–2), the concourse area was designated as "Area A" and "B," and the immediately adjacent area was designated as "Page Airways" and "Operations Room."

The work which the Government meant to accomplish was the removal and replacement in like kind of all of the topping slab in these four named areas, and, in adjoining floor areas (also shown on Drawing DR–2) to proceed as indicated on the drawing, namely, to either clean and polish only or to repair cracks, crushed areas, and then grind and polish. This, as said, was the Government's intent—the scope of work it meant to convey by the details set forth in the drawing.

The contractor, however, read the drawing differently. Plaintiff took the drawing to mean that removal and replacement of the topping slab was a requirement limited to roughly a 2-foot wide perimeter in each of the four areas mentioned above and that all other floor areas shown in the drawing were to be cleaned and polished and, in the case of cracks or crushed areas, to be repaired and then polished.

Although there were several considerations that prompted the contractor to read the drawing in this fashion, the point that was central to this interpretation was the fact that in those particular areas where the floor was to be removed and replaced, the drawing showed hatch marks (i. e., open-ended diagonal lines, uniform in length and in the spacing between them) bordering the perimeter of each of these areas. These hatch marks, or, as they are sometimes also called, section lines, were meant to serve a two-fold purpose. One purpose, evident from the drawing itself, was to identify the type of floor: a legend on the drawing illustrated that where the diagonal line ran from left to right the topping was grind finished select aggregate; where the diagonal slanted in the opposite direction, the topping was hard-

rock concrete. The other purpose of these hatch marks—this as found by the board based upon expert testimony further corroborated by a documentary exhibit—is that they are common symbols used in making architectural drawings which, when left open-ended (not bordered on both sides) are meant to designate an entire area. Thus, open-ended hatch marks drawn around the perimeter of an area are, as the board put it, "a short-cut method of denoting the entire area." 72–1 BCA at 42,925. On the basis of the same evidence, the board also found that "the meaning of such markings should be common knowledge among reasonably experienced contractors accustomed to reading drawings in the construction field." *Id.*

The contractor, despite 24 years of contracting experience, claimed to have never before encountered the use of hatch marks in a contract drawing. And, lacking this knowledge, the balance of the information found on the drawings served only to confirm to the contractor the judgment that removal and replacement of the floor areas was to be confined to the hatched area. For example, in the Page Airways—Operations Room, the drawing stated "Remove existing damaged 4″ thick concrete—replace and finish (hatched area). Replace with new 4″ concrete topping slab, see spec." There were arrows leading from this instruction directly into the hatched perimeter area. Similarly, with respect to the concourse area (Areas A and B), the drawing indicated—again by arrows that terminated in the hatched perimeter—that the contractor was to "Remove all grind finished 4″ ± thick topping * * * and replace and finish topping in accordance with specifications."

In addition to these instructions, the drawing also set out other directions and information which, from the contractor's point of view, seemed to be consistent with, and therefore reinforced the interpretation that removal and replacement of the floor slab was to be restricted to the hatched area. One such direction was a drawing note that pointed to a rough-edged shaded

line that ran, for the most part through the center or non-hatched section of the floor in Areas A and B. The note indicated this was a "Temporary sloping fill, to be removed." In the contractor's judgment, this direction to remove a temporary sloping fill from the center of the floor area could serve no instructional purpose, or, at best would be redundant, if the entire floor in Areas A and B were to be removed and replaced. This would follow from the fact that removal of the floor would necessarily require removal of the floor's temporary fill.

There are still other points which the contractor raised before the board and which are presented once again in this proceeding. Though all are said to favor the reasonableness of the contractor's interpretation, their recitation here is not necessary for the reasons which follow.

## II. Discussion

■ In many past decisions, this court has resorted to evidence of trade custom and practice to either expand or narrow the scope of a contractor's obligation beyond what a literal adherence to the terms of the written contract might otherwise dictate. *See, e. g., Anthony P. Miller, Inc. v. United States,* 422 F.2d 1344, 1352, 191 Ct.Cl. 292, 305 (1970); *Stoeckert v. United States,* 391 F.2d 639, 647, 183 Ct.Cl. 152, 165 (1968); *Gholson, Byars & Holmes Constr. Co. v. United States,* 351 F.2d 987, 999–1000, 173 Ct.Cl. 374, 395–96 (1965). The rule upon which these cases and others of like import rest is that the bargain between the parties is one that is drawn with the trade standards and practices of the relevant business community in mind. *W. H. Edwards Engineering Corp. v. United States,* 161 Ct.Cl. 322, 328 (1963); Restatement (Second) of Law, Contracts 2d § 228(5) (Tent. Drafts Nos. 1–7, 1973); Uniform Commercial Code § 1–205(3). A contractor, in other words, is charged with knowledge of those trade usages which are understood to have a regularity of observance in the vocation in which he is engaged. Thus, even where details of work have been omitted from a

contract drawing, those details are nevertheless to be taken as an understood part of the contractor's obligation if trade custom or practice confirms this to be so. *Anthony P. Miller, Inc. v. United States, supra.*

■ In this case, the board made the finding that the hatch marks in the drawing represented a common convention—a draftsman's abbreviated method of depicting an entire area—the meaning of which "should be common knowledge among reasonably experienced contractors accustomed to reading drawings in the construction field." 72–1 BCA at 42,925. As a factual matter, this finding by the board is unassailable: it is fully supported by the evidence. As a legal matter, this finding determines the outcome: the contractor is charged with knowledge of the trade meaning of the hatch marks that were depicted in the contract drawings.

■ And considered in this altered light, little remains to support the reasonableness of the contractor's own interpretation of the drawing. Perhaps the best that might then be said in plaintiff's favor—and this is but liberal speculation—is that the hatch marks, when given their trade meaning, would create an obvious ambiguity between the floor areas that were to be replaced and those that would be subject only to a cleaning and polishing requirement. In this hypothetical circumstance, the contractor's duty to inquire would be plain. *Beacon Constr. Co. v. United States,* 314 F.2d 501, 504, 161 Ct.Cl. 1, 6 (1963).

As was mentioned briefly at the outset, the board reached its outcome by a different route. It judged the contractor's interpretation of the contract drawing to have been unreasonable and the inspection of the site to have been deficient, thus contributing to the misinterpretation of the drawing. The board charged the contractor with the knowledge of what the site investigation would have revealed and this, it concluded, would have armed the contractor with knowledge sufficient to bring the drawing's interpretation into question.

As a reviewing court, we are, of course, free to draw our own legal conclusions from the facts found below. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 526, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); 41 U.S.C. § 322 (1970), and affirmance of the board's result does not demand endorsement of all that the board had to say. In this case there is no need to examine the analysis on which the board's decision proceeded. Given its finding concerning trade practice and, as explained herein, the legal consequences attendant to that finding, the result that was reached would, in any event, require affirmation.

### III. Conclusion

Based on the reasons set out herein, defendant's motion for summary judgment should be granted, plaintiff's motion for summary judgment should be denied, and the petition should be dismissed.