**INTERWEST CONSTRUCTION, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–1040.

United States Court of Appeals, Federal Circuit.

July 12, 1994.

---

612

**613**

unambiguous as to the required cooling capacity. Moreover, the Board held that, even if the contract requirement was ambiguous, the ambiguity was patent, placing a burden upon Interwest to inquire what capacity the contract actually required, which Interwest failed to do. Because we conclude that the Board did not err in either determination and because, in any event, Interwest's interpretation was unreasonable, we affirm.

## BACKGROUND

The contract explicitly specified that the contractor "[p]rovide components matched to ensure that performance will meet the requirements shown on the drawings," and the drawings specified that the air conditioning system produce 900 tons of cooling capacity. In addition, the contract stated that

> [t]he chillers shall be either furnished with refrigerants [with] an ozone depletion factor (ODF) of .05 or less, or have the capability of conversion to refrigerants HCFC–123 or HFC–134a [low ODF refrigerants] at a later date.

See section 15650, clause 2.1.P.1 of the contract.

After being selected as the lowest bidder, Interwest provided the VA with a 900 ton cooling capacity air conditioning system that contained a high ODF refrigerant, but, in accordance with the second option in clause 2.1.P.1 of the contract specifications, could be converted for use with a low ODF refrigerant. However, because Interwest's chiller system was admittedly unable to operate at a 900 ton capacity level after conversion, the VA rejected the system.

Interwest responded that, although its chiller system used a high ODF refrigerant, it did provide the VA with an air conditioner capable of operating at the 900 tons cooling level. Further, per Interwest, it was unclear whether the contract required a *converted,* low ODF refrigerant chiller system to meet the 900 tons cooling capacity requirement and, in any event, there were no 900 ton chiller units in existence which, when converted, could still provide such performance. Thus, Interwest argued that the contract was ambiguous and that its interpretation that a

Eric C. Olson, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, argued, for appellant.

Lisa B. Donis, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Jeanne E. Davidson, Asst. Director.

Before ARCHER, Chief Judge, NEWMAN and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

Interwest Construction, Inc. (Interwest) appeals the decision of the Department of Veterans Affairs Board of Contract Appeals (Board) upholding the contracting officer's decision denying Interwest's claim for an equitable adjustment. *Interwest Constr. v. VA Medical Ctr., Salt Lake City, Utah,* Nos. DVABCA–3724 & 3890, slip op. at 15, 1993 WL 390518 (DVABCA, Sept. 20, 1993). Interwest claimed it was entitled to $72,293, the additional cost of upgraded air conditioners, because of an ambiguity in its contract with the Department of Veterans Affairs Medical Center, Salt Lake City, Utah (VA), with regard to the cooling capacity required. In its decision, however, the Board found that the contract between the VA and Interwest was

converted chiller system did not have to achieve a 900 ton cooling capacity after conversion was reasonable.

Interwest then posited that the VA, not Interwest, was responsible for the additional cost of procuring a more expensive chiller system that met the VA's specifications and submitted a claim for equitable adjustment in the amount of $72,293. The contracting officer denied Interwest's claim stating that the contract clearly required both unconverted and converted chillers to achieve 900 tons of cooling capacity. The Board upheld the contracting officer's denial, and Interwest now appeals the decision of the Board.

After careful review, we conclude that the Board properly saw no ambiguity in the contract and that, even assuming an ambiguity, it was patent, thereby placing a duty upon Interwest to clarify the contractual requirements, which it failed to do. Finally, we conclude that Interwest's interpretation was not reasonable so that, even assuming a latent ambiguity, it could not recover.

## ANALYSIS

### I. *Standard of Review.*

■ The Board's conclusion that the contract was unambiguous is subject to *de novo* review. *See, e.g., Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed. Cir.1985) (case involving a claim of ambiguity in which the court held that "[t]he interpretation of a contract is a question of law to be decided by the court and an administrative interpretation of a contract is not binding on the court"). Furthermore, whether ambiguities are latent or patent and whether the contractor's interpretation thereof is reasonable are also questions of law subject to *de novo* review.

■ In reviewing such a contract, our court must first consider whether the contract language, taken as a whole, was ambiguous. *Id.* If we conclude that the contract language was ambiguous, we must then determine whether that ambiguity was patent so as to impose a duty to seek clarification, or only latent. *Newsom v. United States,* 676 F.2d 647, 650, 230 Ct.Cl. 301 (1982). Finally, even if we conclude the ambiguity

was latent, we must decide if the contractor's interpretation was reasonable. *Id.*

### II. *Presence or Absence of Ambiguity.*

■ As noted above, we conclude that the contract provisions that are the subject of this dispute are clear and unambiguous. Section 15650, clause 2.1.A of the contract explicitly specifies that the chiller units were to meet the requirements in the contract drawings. Contract drawing H–3 indicates, among other things, that the units must provide 900 tons of cooling capacity. The chiller units were additionally required to contain *either:* (1) a low ODF refrigerant from the outset; or (2) a high ODF refrigerant upon delivery but convertible to a low ODF refrigerant in the future. See section 15650, clause 2.1.P.1 of the contract. In addition, Federal Acquisition Regulation (FAR) § 52.-236.21 was incorporated into the contract and reads:

> Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both.

Interwest argues that, because the contract does not expressly state that a chiller which has been converted from a high ODF refrigerant to a low ODF refrigerant must still meet the cooling capacity requirement, the contract is ambiguous, and the government is responsible for costs associated with the ambiguity. Interwest further argues that, because it was technically and commercially infeasible to convert a high ODF refrigerant chiller to a low ODF refrigerant chiller without sacrificing performance, the contract was ambiguous or, at minimum, the "conversion option" in section 15650, clause 2.1.P.1 would have been read out of the contract.

When the contract provisions are read together, however, they clearly require a chiller system capable of operating at the 900 ton cooling level, regardless of whether they are filled with high ODF or low ODF refrigerant. The contract explicitly stated that system characteristics shown in the drawing were "performance requirements" and, like

all other performance requirements, the 900 ton cooling capacity requirement is unqualified and establishes a minimum that must be met. As stated by John Cibinic, Jr. and Ralph C. Nash, Jr. in FORMATION OF GOVERNMENT CONTRACTS 341 (2d ed. 1986), "[P]erformance type specifications advise the contractor what the final product *must* be capable of accomplishing. . . ." (Emphasis added.) It does not matter whether the chiller system is converted or unconverted. The specific language of the contract mandates that "performance will meet requirements shown on the drawings" and the drawings require 900 tons of cooling capacity. Additionally, the Board correctly noted, "The term 'will meet' cannot be restricted to the present capacity of chillers supplied under the contract. To make such an interpretation would leave the decision of the future cooling capacity of the chillers (after any refrigerant conversion) entirely up to the bidders." Slip op. at 11. Moreover, since the cooling requirements of the VA buildings would remain the same before and after conversion, Interwest's interpretation of the contract (that a reduction in performance to a level below 900 tons for the converted chillers is satisfactory) is clearly unreasonable and contrary to common sense.

■■■ Furthermore, Interwest's preoccupation with what was commercially or technically feasible with respect to reduced performance capabilities of converted chillers is unwarranted. In the face of clear and unambiguous contract language, extrinsic evidence concerning the state of the art in a technology should not be used to introduce an ambiguity where none exists. Where, as here, the contract states the performance requirements, the contractor is obligated to meet them, *Farwell v. United States*, 148 F.Supp. 947, 949–50, 137 Ct.Cl. 832 (1957), despite the fact that "the government may require performance both in excess of, or below, the standard normally accepted in a trade." *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 46 (1989). Thus, as Interwest should have known, the chiller system it offered would still need to meet the 900 ton requirement, even after conversion from high ODF refrigerant to low ODF refrigerant.

■■ Interwest also makes much of the fact that a VA "guide specification" existed, yet was not made part of the contract. The VA "guide specification" explicitly stated that after conversion, the chiller must meet the requirements for total cooling as shown in drawing H–3. Because the VA promulgated this guide, Interwest would have us infer that the VA recognized an ambiguity in the contract and attempted to clarify it. The VA correctly argues, however, that the promulgation of this guide specification is irrelevant to contract interpretation and should not be considered probative because "extrinsic evidence to change the terms of a contract that is clear on its face" may not be considered by a tribunal. *Ralph Larsen*, 17 Cl.Ct. at 43 (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988)). In any event, the guide does not change the terms, but rather upholds them.

Even if, however, the court were to consider the guide specification, the fact that it was omitted from the contract is of no import. It does not support Interwest's argument that an ambiguity existed. Rather, its omission from the contract is best explained by the fact that the guide merely duplicates information that is already clearly contained in the contract.

Thus, the Board did not err in concluding that the contract was unambiguous with respect to the performance required even after conversion of the chillers from a high ODF to a low ODF refrigerant.

### III. *Patent or Latent Ambiguity.*

■■ Even if, however, the contract were deemed to contain an ambiguity, that ambiguity would be patent, thereby placing the burden upon Interwest to seek clarification of the contractual requirements. Interwest had the duty to seek clarification from the VA regarding the conversion option for several reasons.

First, it understood that its chiller, when converted from high ODF refrigerant to low ODF refrigerant, could no longer provide the 900 ton cooling capacity specifically required by the contract. Because Interwest did not seek clarification of the performance require-

ments, it cannot now secure an equitable adjustment arising from the alleged ambiguity. *See, e.g., Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (a patent ambiguity allocates the risk to the contractor and raises a duty for the contractor to clarify the contract).

■ Second, as the Board correctly held: Appellant's assumption that the 900 ton requirement could be dispensed with after conversion to a low ODF refrigerant, without any minimum cooling criteria to be supplied, creates an *obvious void* in the necessary information. A bidder who proceeds without seeking clarification does so entirely at its own risk and must bear the consequences if its assumptions are incorrect.

Slip op. at 14 (emphasis in original). By definition, an "obvious void" or glaring omission can never be a latent ambiguity.

### IV. *Reasonable or Unreasonable Contract Construction.*

■ Even if, however, only a latent ambiguity existed, Interwest's interpretation that it could satisfy the cooling requirements of the VA's building with a 900 ton cooling system which after conversion produced only 747 tons[1] of cooling capacity for the same building cannot be reasonable. Therefore, Interwest did not have the luxury of electing its own solution, namely providing a 747 ton chiller system when the contract called for a 900 ton system, based upon its own, strained interpretation of the contract. One-hundred fifty-three tons out of 900 tons is a significant degradation. Indeed, under Interwest's interpretation even a number lower than 747 tons might suffice. That possibility only underscores the inherent unreasonableness of Interwest's interpretation.

### CONCLUSION

We conclude that the contract terms pertaining to the performance requirements of the chillers were unambiguous, that even assuming latent ambiguity, Interwest's interpretation was unreasonable, and that if pat-

ently ambiguous, Interwest failed to clarify the patent ambiguity as required by *Community Heating & Plumbing.*

Moreover, if we were to rule otherwise, it would only encourage contractors intentionally to under bid, offering plainly insufficient equipment and then, having won the contract award, to bill the government for the additional costs necessary to upgrade the deficient system to meet clearly stated performance requirements. This situation would be financially unfair both to rival bidders and the taxpayers, as well as thermally unfair to the inhabitants of the VA buildings. In addition, we would thereby needlessly multiply appeals in cases requiring none under sound contract interpretation rules. Thus, well settled and practical rules of law preclude Interwest from prevailing.

For the foregoing reasons, we affirm the Board's decision.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. It is inequitable to require the contractor to pay for the VA's after-the-fact reading of the specification, when the specification was, in retrospect, ambiguous, when the ambiguity was latent, and the contractor's reading was reasonable. The government now has the benefit of a chiller that is $72,000 more expensive than the chiller that was bid, at the expense of the contractor who was free of fault. I would remand for a fair allocation of the burdens flowing from the government's less-than-perfect specification.

### A

This is not a case of a contractor cutting corners by installing less than it proposed. This is not a case of concealment, or switch, or any sharp practice or unjust enrichment of the contractor. Indeed, the VA's reading of the contract enriched the government at the expense of the contractor, for the parties did not bargain for and there was no meeting of minds on the chiller that the government required Interwest to install.

---

1. See Appellant's Brief at 8.

The contract specification was read by the contractor and others in the trade as authorizing the chiller that was bid. Section 2.1 paragraph A required chiller cooling capacity to "meet requirements shown on the drawings." The drawings showed 900–ton capacity. Paragraph C authorized use of "one of the halogenated hydrocarbon gases as refrigerant." Paragraph P stated that the chiller shall be furnished with either a low-ODF refrigerant or be capable of conversion to low-ODF if required "at a later date." Paragraph P does not state that the 900–ton capacity must be maintained after conversion, and it was conceded that the government knew that this was technologically impossible at the time.

All of the prospective subcontractors bid in the same way. All read the contract specification as requiring a chiller with a 900–ton capacity as installed. None bid on a chiller having an additional installed capacity of at least 150 tons, as would have been required on the government's interpretation of paragraph P.

### B

A patent ambiguity is one that is recognized as "an obvious omission, inconsistency, or discrepancy of significance." *Beacon Construction Co. of Mass. v. United States,* 314 F.2d 501, 504, 161 Ct.Cl. 1 (1963). The doctrine of patent ambiguity is an exception to the rule of *contra proferentum,* to ensure that contractors do not take unfair advantage of the government by remaining silent in the face of a significant and obvious ambiguity in the contract. *Newsom v. United States,* 676 F.2d 647, 649, 230 Ct.Cl. 301 (1982). The government is not relieved of all responsibility, however, for "as the author, [it] has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions—as well as the main risk of a failure to carry that responsibility." *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 877, 163 Ct.Cl. 1 (1963).

A patent ambiguity places a duty of inquiry upon the contractor. *Interstate General Government Contractors v. Stone,* 980 F.2d 1433, 1434–35 (Fed.Cir.1992). "The existence of a patent ambiguity *in itself* raises the duty of inquiry, regardless of the reasonableness *vel non* of the contractor's interpretation." *Newsom,* 676 F.2d at 650 (emphasis in original). A latent ambiguity, in contrast, exists when the ambiguity is "neither glaring nor substantial nor patently obvious." *Mountain Home Contractors v. United States,* 425 F.2d 1260, 1264, 192 Ct.Cl. 16 (1970). If the ambiguity is latent the court will consider whether the contractor's interpretation of the contract was reasonable. *Newsom,* 676 F.2d at 650.

### C

I agree that there is ambiguity in this contract. However, it is not patent, for the contract is silent as to the capacity requirement and other conversion obligations in the event of the contingency. Upon such silence, the contractor acted reasonably in bidding a chiller having 900–ton capacity as installed, paragraph C, and capable of conversion, paragraph P.

In interpreting the terms of a construction contract, "the bargain between the parties is one that is drawn with the trade standards and practices of the relevant business community in mind." *Alfred A. Altimont, Inc. v. United States,* 579 F.2d 622, 625, 217 Ct.Cl. 628 (1978). The contemporaneous reading of these specifications by all of the potential subcontractors who bid must be given appropriate weight. *See Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (evidence of other bidders' interpretations of the contract considered in determining the reasonableness of a contractor's interpretation of latent ambiguity).

None of the potential subcontractors read the contract as does the government. The drawing was read as requiring the 900–ton capacity upon installation, not future contingency. None of those concerned offered the more expensive chiller now demanded by the government. It appears that none of those concerned spotted the now-asserted ambiguity, for the Board stated that "there is no record that any of the bidders or potential subcontractors for this project ever sought

clarification of the chiller specifications and drawings prior to the opening of bids."

## D

The contractor agrees that subparagraph (2) of the VA Guide Specification would have changed its view of what was required. However, subparagraph (2) was omitted from the contract, although subparagraph (1) was included. It is hard to understand the omission of subparagraph (2). However, we must conclude that the omission was either deliberate, in which case the requirement now imposed was not intended to be included, or the omission was erroneous, in which case the consequences of the error must be borne by the party who made the error.

Indeed, I doubt that the government intended to require the initial installation of a chiller of significantly more than 900-ton capacity, or an otherwise more expensive chiller than was needed, simply to provide for the remote contingency of conversion. This requirement would have significantly raised the cost to the VA and the taxpayer. When those in the trade all read a specification in the same way and see no need to inquire, it is unwarranted for a court to decide that an ambiguity, when it appears, is other than latent.

The question is not whether the VA's interpretation of its own contract was reasonable. The question is whether that of Interwest was reasonable. Interwest's reading was for the most economical equipment, surely a factor in reasonableness. If the specification was not so flagrantly ambiguous that the contractor must be held to an absolute duty to inquire, and if the contractor acted reasonably, then fairness requires that the additional cost required by the government must be equitably allocated. I would remand for that purpose.