ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| CJW Contractors Inc. | ) ASBCA No. 63228 |
| | ) |
| Under Contract No. N40085-16-D-0300 | ) |

APPEARANCES FOR THE APPELLANT:  Douglas L. Patin, Esq.
                                Erik M. Coon, Esq.
                                  Bradley Arant Boult Cummings LLP
                                  Washington, DC

APPEARANCES FOR THE GOVERNMENT:  Craig D. Jensen, Esq.
                                  Navy Chief Trial Attorney
                                 Robyn L. Hamady, Esq.
                                  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD
PURSUANT TO RULE 12.3

This appeal involves a dispute regarding the replacement of the heating system in Buildings 3, 4, and 5, at the Naval Support Activity in Mechanicsburg, Pennsylvania. CJW Contractors, Inc. (CJW) seeks to recover additional costs that it claims it incurred from furnishing and installing 52 20-foot long W6x15 steel I beams in Building 5. CJW argues that the Navy failed to (1) include a structural steel section or require Steel I beams in Building 5's specifications despite explicitly referencing steel W and S beams, and (2) provide structural and mechanical design drawings free from latent ambiguities and contradicting design details. The Navy asserts that CJW improperly interpreted the contract by failing to read the drawings and specifications as a whole, and that any ambiguities in the contract documents were patent and thus imposed a duty upon CJW to inquire before the contract was awarded. We sustain the appeal.

FINDINGS OF FACT

1. On December 7, 2015, the Navy awarded Contract No. N40085-16-D-0300 (the contract) to CJW. The contract was a multiple award construction contract for new construction, renovation, alteration, and repair projects primarily located in Pennsylvania. (R4, tab 1 at GOV0001)

2. The contract included a one-year base period with four option years. The guaranteed minimum award amount was $5,000, with an estimated construction cost for

all contracts not to exceed $95,000,000 for the life of the contract. (R4, tab 1 at GOV0038)

3. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997), which provides:

> Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer.

(R4, tab 1 at GOV0057)

4. The contract included FAR 52.216-18, ORDERING (OCT 1995), which provides:

> All delivery orders or task orders are subject to the terms and conditions of this contract. In the event of conflict between a delivery order or task order and this contract, the contract shall control.

(R4, tab 1 at GOV0059)

5. The contract included Defense Federal Acquisition Regulation Supplement (DFARS) 252.236-7001, CONTRACT DRAWINGS AND SPECIFICATIONS (AUG 2000), which provides:

> (a) The Government will provide to the Contractor, without charge, one set of contract drawings and specifications, except publications incorporated into the technical provisions by reference, in electronic or paper media as chosen by the Contracting Officer.
>
> (b) The Contractor shall—
>
> (1) Check all drawings furnished immediately upon receipt;

(2) Compare all drawings and verify the figures before laying out the work;

(3) Promptly notify the Contracting Officer of any discrepancies;

(4) Be responsible for any errors that might have been avoided by complying with this paragraph (b); and

(5) Reproduce and print contract drawings and specifications as needed.

(c) In general—

(1) Large-scale drawings shall govern small-scale drawings; and

(2) The Contractor shall follow figures marked on drawings in preference to scale measurements.

(d) Omissions from the drawings or specifications or the misdescription of details of work that are manifestly necessary to carry out the intent of the drawings and specifications, or that are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work. The Contractor shall perform such details as if fully and correctly set forth and described in the drawings and specifications.

(e) The work shall conform to the specifications and the contract drawings identified for the project.

(R4, tab 1 at GOV0071-72)

6. The government exercised the contract's option years through December 6, 2020, via Modification Nos. P00001 through P00004 (R4, tabs 2-5).

7. On or about July 31, 2019, the Naval Facilities Engineering Systems Command (NAVFAC), Mid-Atlantic issued a firm-fixed-price multiple award construction contract (MACC) task order request for proposal (RFP) No. N4008519R1791 entitled "BUILDING 3, 4 AND 5 REPLACE HEAT SYSTEM" at Naval Support Activity Mechanicsburg, Pennsylvania (R4, tab 6).

8. The RFP described the scope of the work as follows:

> This project consists of the replacement of the existing heating system in buildings 3, 4 and 5. Project will remove the existing furnace and associated items including ductwork, registers and asbestos board and install new heating units, air intakes, vent units, and miscellaneous equipment to accomplish a functional heating system. The new work includes installation of associated wiring and controls. This [is] a DLA Distribution funded project for Building 3, 4 and 5 at NSA Mechanicsburg, PA. Complete the entire work ready for use not later than 380 calendar days after notice to proceed.
>
> **Drawings for Work Orders# 1588370, 1588369, 1588367 Attachment 4.**

(R4, tab 6 at GOV0090) (emphasis in original)

9. The work in building 5 included, among other things, the installation of a hydronic heating system, which relies on water run through a pipe to heat the building (gov't br. ex. 1 (Lefin decl.) ¶ 8).

10. The RFP provided:

> All contract clauses contained in the respective MACC [indefinite delivery, indefinite quantity] contracts are hereby incorporated into this solicitation and the resultant task order. If there are any conflicts between the contract clauses and the information outlined in the resultant task order, the contract language takes precedence over the information in the task order.

(R4, tab 6 at GOV0090)

11. The RFP included two sets of complete design specifications and drawings, one for Buildings 3 and 4 and one for Building 5 (R4, tabs 6c-6d). Paragraph 10 of the RFP provided that "[t]his project is for Design Bid Build **construction only**. *(There is no requirement for design effort)* and includes a 100% design package." (R4, tab 6 at GOV0091) (emphasis in original)

12. While the specifications for Buildings 3 and 4 included a section for Structural Steel at 05 12 00 (R4, tab 6d at GOV0172), the specifications for Building 5

did not (R4, tab 6d).  The Structural Steel specifications for Buildings 3 and 4 provided a detailed list of the American Society for Testing and Materials (ASTM) requirements for every steel part, ranging from structural steel beams and pipes all the way down to steel bolts, nuts, and washers (R4, tab 6d at GOV0511-14).  No such list was provided for Building 5 (R4, tab 6d).

13.  Attachment #3 to the RFP included the Basis of Design for the project, which consisted of 64 pages of drawings related to Replacing Heating Systems in Buildings 3, 4 & 5 (R4, tab 6c; *see also* R4, tab 6 at GOV0093).

14.  General Note 2 of Drawing S-001 provides:  "STRUCTURAL DRAWINGS MAY NOT SHOW ALL EQUIPMENT PADS AND OTHER EQUIPMENT SUPPORTS REQUIRED.  REFER TO CIVIL, ARCHITECTURAL, MECHANICAL AND ELECTRICAL DRAWINGS" (R4, tab 6c at GOV0134).

15.  Drawing S-101, "STRUCTURAL, AIR HANDLING UNIT SUPPORT PLAN," shows the distance between the roof beams (also known as "bays").  The spacing between 28 of the 30 roof beams is 20 feet, with two of the beams spaced at 20 feet and three inches.  (R4, tab 6c at GOV0135; Lefin decl. ¶ 9)

16.  Drawings M-101 and M-102 provide the Mechanical Floor Plan, New Work, North and South respectively.  The drawings reflect the pipe diameters for both the Heating Water Supply (HWS) and Heating Water Return (HWR) lines to the boiler room.  All piping shown is less than 10 inches in diameter.  (R4, tab 6c at GOV0153-54; Lefin decl. ¶ 12; *see also* app. supp. R4, tab 34 at GOVPROD0038)

17.  Drawing M-502, detail 3 provides information about "TYPICAL PIPE HANGER SUPPORTS" (R4, tab 6c at GOV0158).  Detail 3 in Drawing M-502 shows a typical pipe hanger support detail, which stops at the "THREADED ROD," which itself attaches to the structure (*id.*).  Detail 5 in Drawing S-501 provides the same structure, which includes a W6x15 I beam (*id*. at GOV0136; Lefin decl. ¶ 15).

18.  Attachment 4 to the RFP contains the Specifications for Building 5 (R4, tab 6d at GOV0860-1852).[1]

---

[1] The cover page for specifications relating to Building 5 is labeled "Replace Heating Systems, Bldgs 3 & 4" while the remainder of the specifications indicate that they are related to the project "Replace Heating System in Building 5" (*compare* R4, tab 6d at GOV0859, *with* R4, tab 6d at GOV0860-1852).  This is an obvious clerical error in specifications because all the specification that related to "Replace Heating System in Building 5" are clearly indicated in the upper left-hand corner of the specifications (*see* R4, tab 6d at GOV0860-1852).

19.  Specification § 01 11 00, ¶ 1.2.1 provided the project description:

> The intent of this project is to replace existing warm, forced-air furnaces in Building 5 with a new, dual fuel hydronic heating system and to renovate the administrative offices in the warehouse.  The work includes demolition, hazardous material abatement, installation of new mechanical equipment, renovation of the administrative annex, and incidental related work.

(R4, tab 6d at GOV0865)

20.  Specification § 22 00 00, PLUMBING, GENERAL PURPOSE, ¶ 1.1 provided:  "[t]he publications listed below form part of this specification to the extent referenced" and the "publications ate referred to within the text by the basic designation only."  (R4, tab 6d at GOV1336).  Included in the list of publications were several by the Manufacturers Standardization Society of the Valve and Fittings Industry (MSS),[2] including MSS SP-58 (*id*. at GOV1345).

21.  MSS SP-58 pertains to "Pipe Hangers and Supports – Materials, Design Manufacture, Selection, Application, and Installation" (app. supp. R4, tab 41).

22.  MSS SP-58 Section 5.2, Hanger and Support Spacing for Horizontal Piping, provides that "[t]he maximum spacing for hangers and supports is provided in Table 4" (app. supp. R4, tab 41 at 8).  Table 4 of MSS SP-58 reflects that for Standard Weight Carbon Steel Pipe with Water Service ranging from nominal pipe size (NPS) of 1/4 inch to 4 inches (the largest diameter pipe used in Building 5), the maximum hanger support

---

[2] The Manufacturers Standardization Society of the Valve and Fittings Industry:

> "is a non-profit technical association organized for development and improvement of industry, national and international codes and standards for Valves, Valve Actuators, Valve Modifications, Pipe Fittings, Flanges, Pipe Hangers and Supports, and Associated Seals.  Since its establishment in 1924, MSS has been dedicated to developing standards for national and global applications, in cooperation with other standardizing bodies and regulatory authorities. **MSS is an American National Standards Institute (ANSI)-accredited standards developer.**"

(App. supp. R4, tab 41 at 115) (emphasis in original)

6

spacing for horizontal pipe (the hydronic pipe used for Building 5) is from 7 to 14 feet respectively (*id.* at 12; Lefin decl. ¶ 16).

23.  Specification § 22 00 00, ¶ 2.3, Pipe Hangers, Inserts, and Supports, provided that "[p]ipe hangers, inserts, and supports shall conform to MSS SP-58" (R4, tab 6d at GOV1352).

24.  Specification § 21 13 16, DRY-PIPE FIRE SPRINKLER SYSTEMS, ¶ 2.1.3, Pipe Hangers and Supports, directed the contractor to "[a]ttach to steel joists with MSS SP-58, Type 19 or 23 clamps and retaining straps" and specifically referenced the need to "[a]ttach to Steel W or S beams with Type 21, 28, 29, or 30 clamps" (R4, tab 6d at GOV1333).

25.  Specification § 22 00 00, ¶ 2.8.3. Pipe Hangers (Supports) required the contractor to "[p]rovide MSS SP-58 Type 1 with adjustable type steel support rods, except as specified or indicated otherwise.  Attach to steel joists with Type 19 or 23 clamps and retaining straps.  Attach to Steel W or S beams with Type 21, 28, 29, or 30 clamps" (R4, tab 6d at GOV1356).

26.  There was no mention of any I beams in the Building 5 specifications (R4, tab 6d).

27.  Specification § 22 00 00, ¶ 3.1.6.3, Pipes, Hangers, Inserts, and Supports, provided that "[i]nstallation of pipe hangers, inserts and supports shall conform to MSS SP-58 except as modified herein" (R4, tab 6d at GOV1362).

28.  Subparagraph 3.1.6.3.i of Specification § 22 00 00 provided:

> Horizontal pipe supports shall be spaced as specified in MSS SP-58 and a support shall be installed not over 1 foot from the pipe fitting joint at each change in direction of the piping. Pipe supports shall be spaced not over 5 feet apart at valves. Operating temperatures in determining hanger spacing for PVC or CPVC pipe shall be 120 degrees F for PVC and 180 degrees F for CPVC.  Horizontal pipe runs shall include allowances for expansion and contraction.

(R4, tab 6d at GOV1363)

29.  Specification § 23 05 15, Common Piping for HVAC, ¶ 2.1.1, Type BCS, Black Carbon Steel, provided:  "[e]nsure pipe DN6 through DN300 1/8 through 12 inches is Schedule 40 black carbon steel, conforming to ASTM A53/A53M" (R4, tab 6d at GOV1422).  For these pipe sizes, Schedule 40 is considered standard weight pipe (Lefin decl. ¶ 12).

7

30. Specification § 23 05 15, ¶ 2.6.1, Building Structure Attachments, and its subparagraphs (2.6.1.1 through 2.6.1.4) required that all heating, ventilation, and air conditioning (HVAC) piping structure attachments conform to MSS SP-58 (R4, tab 6d at GOV1434-35). For example, subparagraph 2.6.1.2 required that "beam clamps are center-loading MSS SP-58 Type 20" (*id.* at GOV1435).

31. Specification § 23 05 15, Common Piping for HVAC, ¶ 3.3, Supporting Elements Installation, provided in pertinent part:

> Provide supporting elements in accordance with the referenced codes and standards.
>
> Support piping from building structure. Do not support piping from roof deck or from other pipe.

(R4, tab 6d at GOV1438)

32. CJW interpreted Detail 3 on Drawing M-502 to mean that the pipe hanger supports would be attached to the existing structure shown on Drawing S-101, i.e., the existing steel W and S beams (app. br. ex. 1 (Sherry decl.) ¶ 5). CJW bid for the project with the intention of using standard clamps to support the hydronic piping from the existing steel W and S roof beams (*id.* ¶ 6).

33. On September 27, 2019, the Navy awarded Task Order N40085-19-F-6770 (the TO) to CJW in the amount of $3,549,000 (R4, tab 7 at GOV1854-55).

34. The TO included firm-fixed price contract line item number (CLIN) 0001, "Building 3, 4, and 5 Replace Heat System." CLIN 0001 included work associated with Building 5, which was awarded in the amount of $1,992,313.68 (R4, tab 7 at GOV1855).

35. The TO incorporated three amendments to the RFP, including the "Revised Task Order Document" and government responses to pre-award requests for information (RFIs) #1 through 6 (R4, tab 7 at GOV1858). None of the pre-award RFIs related to hydronic piping support (*id.*).

36. On February 10, 2020, CJW's quality contract manager, Mr. Timothy Sherry, submitted RFI 003, which stated:

> The detail on page S-501 (Typical Pipe Hanger Supports Detail – 5) suggests that a W6x15 beam be installed to span existing roof beams. Is the intention of this, "typical" detail to install beams to span every roof beam span where hydronic piping is being supported?

The roof framing plan on S-101 does not indicate the installation of beam supports and the specifications for Building 5 do not include a specification section for structural steel.

CJW does not interpret this detail as "typical", if beams are to be provided to span every roof beam where hydronic piping is supported, this would require a change modification to the contract.

(App. supp. R4, tab 18 at GOVPROD0015)

37. On March 3, 2020, the Navy responded to RFI 003 as follows:

The Government does not concur with the contractor's interpretation as defined above. We provide the following explanation and refer to the contract drawings and specifications:

1. Specification § 22 00 00, paragraphs 3.1.6.3.i, General Purpose Plumbing requires the contractor to provide pipe support spacing pursuant to the requirements in MSS-SP-58. In this standard, Table 4 provides the required hanger spacing based on the diameter of the pipe being supported, the schedule of the pipe, and assumes that the pipe is filled with water. It is not until the pipe diameter reaches 10 inches that the span distance between supports exceeds 20 feet - which is the distance between roof joists as indicated on drawing S-101. This means that intermediate supports (between roof joists) are required for smaller diameter piping - which ALL of the piping on this project is.

2. Detail 5 on drawing S-501 provides a clear method to install the hydronic piping. This support detail is not a building structural component and therefore would not be included on the structural framing plan provided on drawing S-101.

3. Due to the limited amount of structural steel required for this project, rather than including another specification section with the contract documents, structural steel

9

requirements were provided on the structural cover sheet S- 001.

Please proceed with installation of the hydronic piping as shown on the contract drawings.

The as-awarded design documents provide constructible details to provide adequate pipe support for a functional hydronic heating system. No change to the contract terms and conditions is required or justified.

(App. supp. R4, tab 18 at GOVPROD0015)

38. On April 1, 2020, Mr. Sherry submitted RFI 003.1, which noted that "CJW is requesting an alternate pipe hanger detail than illustrated in the contract drawings" (app. supp. R4, tab 19 at CJW0046).

39. On April 2, 2020, Mr. William Weiser, NAVFAC's construction manager and contracting officer's representative, forwarded CJW's alternative proposal to Mr. Tom Andrejev, a Navy structural engineer, to inquire if there were any structural concerns with the proposal. That same day, Mr. Andrejev replied that, structurally, he did "not see an issue of supporting the pipe from the bottom chord of the truss" because "[t]ypical structural design always includes some allowance for the weight of utility," but recommended against it because doing so would reduce building overhead clearance. (App. supp. R4, tab 21)

40. On April 7, 2020, Mr. Sherry sent an internal email stating that he was told during a quality control meeting conference call that its proposed alternative would not be acceptable without an engineering assessment and credit to the government (app. supp. R4, tab 22 at CJW0007). That same day, Mr. Weiser stated in an internal email to Navy personnel that:

Also, they are still struggling with the fact they did not adequately bid the steel support and provided to us a follow-on RFI requesting to hang the hot water piping from the existing truss. It is our intent to deny this request as it poses several disadvantages to include reduced piping height, loss of a future mounting location, and lack of engineering analysis to verify that the truss can support the weight of the piping. I only bring this up as if DLA were willing to consider this alternate proposal for a credit to the

10

Government, I could pursue with the Contractor what level of
credit they may be willing to offer.

(App. supp. R4, tab 23)

41.  By email dated April 8, 2020, Navy Defense Logistics Agency (DLA)
Installation Support employee Mr. Dilip Patel stated that in coordination with Mr. Weiser
and DLA mechanical engineer Mr. David Lefin, he determined that "CJW's alternate pipe
hanger detail attached to the bottom chord of truss with clamps rather than as illustrated in
contract drawing is acceptable."  (App. supp. R4, tab 23 at GOVPROD0021)  Mr. Patel
further stated that "DM-FSI is willing to consider this alternate proposal for a credit to the
Government."  (*Id.*)

42.  By email dated April 16, 2020, CJW's project manager, Mr. Pavan Kondisetti,
transmitted CJW's Value Engineering Change Proposal (VECP) to NAVFAC's
Mr. William Weiser (app. supp. R4, tab 25 at GOVPROD0026).

43.  By email dated April 30, 2020, Mr. Weisser responded to Mr. Kondisetti's
April 16 email as follows:

> We have brought forth the proposal to the end user/DoR as
> well as the KO.  It is our belief that the proposal is technically
> feasible and the KO is supportive of utilizing the Value
> Engineering Contract Clause in an attempt to resolve this
> issue in a contractually allowable manner that enables CJW to
> successfully complete this project.
>
> Having said that, the proposal cannot be accepted in its
> current state.  Altering the design detail for support of the hot
> water piping is a significant engineering deviation and the
> complete engineering analysis of this deviation cannot be a
> GOV responsibility.  To allow acceptance of this proposal
> CJW would be required to engage a qualified licensed
> engineer to provide analysis and certification that the revised
> detail is structurally sound and will not have adverse impacts
> on the existing structure. This engineering analysis would
> have no impact on the GOV's portion of the proposed
> "instant contract savings."

11

Please let me know if you want to pursue an engineering analysis and I will look to quickly get you applicable existing facility structural drawings.

(App. supp. R4, tab 25 at GOVPROD0025)

44. By email dated May 18, 2020, Mr. Kondisetti responded to Mr. Weisser's April 30 email:

The existing structural drawings have been reviewed by our structural engineer. It is our understanding that the information we have is very limited and simply not sufficient to carry out structural analysis, and for us to provide the required analysis is going to take a lot of time and will hold up construction activities. This would require another RFI to be generated for additional documentation from DOR. We would like to inform that this is not in CJW's scope to review additional documentation and provide a solution. Even if we were to perform structural analysis, which we think is not possible, we don't understand the intention behind this as it was mentioned on RFI 3 response that beams are not indicated on roofing plan because they are not a building structural member. We would like to ask if the beams are not structural members of the building, why is the government requiring CJW to provide an engineering analysis of our proposed alternate install method? This is a bid build project, the responsibility of providing additional design calculations would fall on the DOR, not CJW. We would assume that an engineering analysis would have been already performed to determine if the structure could accommodate the additional weight of the beams and hydronic piping. With that said, CJW requests NAVFAC to make a determination after having reviewed our response with DOR. We would appreciate a quick resolution to this issue as we really want to move forward with this work in Bldg. 5. Please let us know as soon as possible.

(App. supp. R4, tab 25 at GOVPROD0024)

12

45. By email dated May 19, 2020, Mr. Weisser responded to Mr. Kondisetti's May 18 email, stating:

> The Government never requested CJW to install the hydronic hot water piping utilizing a detail that differed from the "Typical Pipe Hanger Supports Detail" 5/S-501. The Government's detailed response to RFI-003 explicitly directed CJW to install the hot water pipe supports in accordance with the existing design detail.
>
> CJW provided an unsolicited Value Engineering Change Proposal with an alternate detail. GOV consideration of this detail was given with the aim of partnering with CJW to attempt to enable successful and timely completion of the heating upgrade that was mutually beneficial to both CJW and the GOV, even though the alternate detail carried some significant disadvantages, such as lower clear height to warehouse floor. A significant effort was expended by NAVFAC to evaluate the proposal for technical feasibility and to build consensus among the facility end user, DoR, and the NAVFAC Contracting Officer that potential acceptance of the VECP was in the interest of the GOV.
>
> Since this is not a Government developed design detail, it is the responsibility of CJW to ensure the alternate mounting detail is fully developed from an engineering perspective. Value Engineering Change proposals are not to incur additional design effort by the Government DoR. This is also a primary reason that the VECP allows for sharing of the "instant contract savings." The FAR is explicitly clear regarding the definition of "instant contract savings" as the construction effort that is saved. The Contractor developing the VECP is responsible for all costs to ensure the proposal is fully vetted acceptable for construction.
>
> I am extremely dismayed by CJW's unfair and unreasonable expectation that the GOV will perform this design effort and take the engineering risk for the alternate detail, intended solely for the benefit of CJW. It is now clear that further consideration of this VECP is no longer in the Government's interest.

13

My expectation is CJW will diligently proceed to prosecute the work by installing the hot water piping in accordance with the as-awarded contract documents and the response to RFI- 003.

(App. supp. R4, tab 25 at GOVPROD0023)

46. By email dated May 19, 2020, Mr. Kondisetti informed the Navy that CJW would proceed under protest and that it would also submit a request for equitable adjustment (REA) (app. supp. R4, tab 29 at CJW0036). Ultimately, CJW performed the work and installed the hot water hydronic pipes in Building 5 in accordance with the Navy's direction in response to RFI 003 (app. supp. R4, tab 34 at GOVPROD0037; *see also* gov't br. ex. 2 (Weisser decl.) ¶ 12).

47. The As-Built drawings reflect that CJW installed the hydronic pipe hanger supports with the W6x15 beams exactly as specified in detail 5 of Drawing S-501 and detail 3 of Drawing M-502 with no changes to the original drawing (app. supp. R4, tab 36 at GOVPROD0061 (Drawing S-501), GOVPROD0100 (Drawing M-502). Accordingly, the drawings were constructable as drafted and did not include internal conflicts (Weisser decl. ¶ 12).

48. On December 14, 2021, Mr. Kondisetti submitted a request for equitable adjustment (REA) in the amount of $84,574.95 due to a "discrepancy between detail 5 on S501 and detail 3 on M501" (R4, tab 13 at GOV1898; *see also* compl. ¶ 15).

49. By letter dated January 7, 2022, the Navy denied the REA (app. supp. R4, tab 33).

50. By letter dated January 25, 2022, CJW resubmitted its REA and requested a final decision from the Navy's contracting officer (CO) (compl. ¶ 16; R4, tab 14).

51. On March 17, 2022, the CO issued a final decision denying CJW's claim in its entirety (compl. ¶ 17; R4, tab 15).

52. On March 21, 2022, CJW appealed the CO's decision to the Board.

## DECISION

*The Parties' Contentions*

CJW argues that it reasonably interpreted the design specifications and drawings for Building 5 to require that the pipe hanger support would be installed from the existing steel W and S roof beams (app. br. at 9-11; app. reply at 8-12), and that the contract documents for Building 5 contained latent ambiguities that should be construed against

14

the Navy (app. br. at 11-14; app. reply at 13-15).  The Navy contends that CJW improperly interpreted the contract documents for Building 5 (gov't br. at 3-7), that the contract's requirements were unambiguous (*id.* at 8-10), and that any ambiguities in the Building 5 contract were patent (*id.* at 10-11).

*Standard of Review*

Board Rule 11 allows the parties to waive a hearing and instead have the Board issue a decision based on the record.  (Board Rule 11(a)).  "Unlike a motion for summary judgment, which must be adjudicated on the basis of a set of undisputed facts, pursuant to Board Rule 11, the Board 'may make findings of fact on disputed facts.'"  *U.S. Coating Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031 (citation omitted).  As the proponent of the claim, CJW bears the burden of proving liability and damages in this appeal.  *Stobil Enter.*, ASBCA Nos. 61688, 61689, 19-1 BCA ¶ 37,400 at 181,809 (citing *Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994)).

*CJW's Interpretation of the Building 5 Specifications and Drawings Was Reasonable*

CJW argues that it reasonably interpreted the design specifications and drawings for Building 5 to require that the pipe hanger support would be installed from the existing steel W and S roof beams (app. br. at 9-11; app. reply at 8-12).  The Navy asserts that CJW's interpretation is unreasonable because it is not logically consistent with the contract (gov't br. at 3-7).  Specifically, the Navy alleges that CJW's interpretation is unreasonable "because it reads out of the contract detail 5 of drawing S-501 that clearly requires the installation of W6x15 beams to provide intermediate support for hot water hydronic pipe" (*id.* at 5).

Contract terms must be interpreted and read as a whole, giving reasonable meaning to all of their parts, and without leaving "a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  The Board must look to the contract's plain language to determine whether an ambiguity exists.  *American Int'l Contractors, Inc.*, ASBCA No. 60948, 18-1 BCA ¶ 37,061 at 180,411.  A contract is ambiguous if it is reasonably susceptible to more than one interpretation.  *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986).  It is not enough that the parties differ in their respective interpretations of the contract's terms for an ambiguity to exist.  *Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999).  Rather, each party's interpretation must fall within a "zone of reasonableness."  *Id.*  If the contract's terms are clear and unambiguous, they must be given their plain and ordinary meaning.  *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).  The Board may not use extrinsic evidence to "introduce an ambiguity where none exists."  *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed. Cir. 1994); *see also Int'l Contractors*, 18-1 BCA ¶ 37,061 at 180,411.  "A contractor's reasonable interpretation

need not be the best interpretation. It need only be within the zone of reasonableness." *City Elec., Inc.*, ASBCA No. 24565, 82-2 BCA ¶ 16,057 at 79,661.

We find that CJW's interpretation of the contract was reasonable. Unlike the specifications for Buildings 3 and 4, the specifications for Building 5 did not include a section for structural steel (app. br. at 9-10; finding 12). Additionally, as CJW maintains, the Building 5 Specifications were devoid of any requirement to attach pipe hangers to steel I beams, and in fact did not refer to steel I beams at all (app. br. at 10-11). Furthermore, we find that CJW reasonably interpreted the drawings for Building 5 to indicate that the pipe hangers would be supported by the existing steel W and S roof beams using standard pipe hanger clamps (*id.*). Detail 5 on Drawing S-501 only refers to "W6x15 SPANNING BETWEEN ROOF BEAM," but the drawing provides no indication as to whether the beams are existing or required (R4, tab 6c at GOV0136; *see also* finding 17). Moreover, Drawing S-101 was the only drawing depicting the roof structure, but that drawing did not show any I beams spanning across the existing roof beams for Building 5 (R4, tab 6c at GOV0135; *see also* finding 32). CJW contends that the "structure" in detail 3 of Drawing M-502 meant the existing steel W and S roof beams referenced in Specification Section 23 05 15, which called for the contractor to "[s]upport piping from building structure" (app. reply at 9). While the Navy counters that CJW undermines its own argument by stating that "[d]etail 3 on M-502 does not refer to [d]etail 5 on S-501, but [d]etail 5 on S-501 cites [d]etail 3 on M-502" (gov't br. at 5; app. br. at 13; *see also* R4, tab 6c at GOV0136, GOV0158; findings 17, 32), CJW would have had no reason to refer back to Drawing S-501 given the lack of a cross reference on Drawing M-502 (*see* R4, tab 6c at GOV0136, GOV0158).

The Navy further argues that CJW's interpretation "overlooks several pertinent contract specifications" including the MSS SP-58 standards in Specification Section 22 00 00 (gov't br. at 5). However, these specifications pertain to the PLUMBING, GENERAL PURPOSE specification, which does not apply to the HVAC hydronic pipe support issues relevant to this appeal (*see, e.g.*, R4, tab 6d at GOV1336, GOV1352, GOV1362). Finally, the Navy argues that CJW's interpretation was unreasonable because it ignored specifications relating to the maximum spacing between pipe hanger supports (gov't br. at 6-7). However, as explained above, the relevant specifications were not applicable.

It would be improper to read in the steel I beams as a requirement when the Navy failed to clearly indicate as such in the contract documents. *See Meredith Constr. Co.*, ASBCA No. 41736, 93-2 BCA ¶ 25,864 (holding that a government interpretation was unreasonable because it called for work at the job site to remove surface imperfections on steel when the government removed the specification calling for that requirement from the standard specification). Accordingly, we find that CJW's interpretation falls within a "zone of reasonableness." *Metric Constructors*, 169 F.3d at 751; *City Elec., Inc.*, 82-2 BCA ¶ 16,057 at 79,661.

16

*Any Ambiguities in the Building Specifications Were Latent*

Ambiguities fall under two categories—latent and patent. *Certified Constr. Co. of Ky.*, ASBCA No. 57872, 15-1 BCA ¶ 36,068 at 176,132. The general rule is to construe ambiguous contracts against the drafter. *Metric Constructors*, 169 F.3d at 751. However, in the case of a patent ambiguity—one "sufficiently glaring to trigger" a reasonable contractor to inquire before submitting a bid—the ambiguity is construed against the contractor. *Certified Constr. Co.*, 15-1 BCA ¶ 36,068 at 176,132; *see also HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004). A patent ambiguity imposes upon the contractor an affirmative obligation to inquire to the government. *Parsons Evergreene*, ASBCA No. 58634, 18-1 BCA ¶ 37,137 at 180,803. If the government's response does not clear up the ambiguity, the contractor's duty to inquire further continues. *Id.* In the case of a latent ambiguity—one that is not patent— the general rule of construing the ambiguity against the drafter applies. *Metric Constructors*, 169 F.3d at 751; *see also Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988).

Unlike the specifications for Buildings 3 and 4, which explicitly required steel I beams, Building 5's specifications only referenced steel W and S beams and made no mention of steel I beams (R4, tab 6c). Drawing S-101 was the only drawing depicting the building's roof structure, but the drawing did not include or refer to any I beams (R4, tab 6c at GOV0135). The only reference to or depiction of W6x15 I beams was buried in detail 5 on Drawing S-501 (R4, tab 6c at GOV0136). This was not an ambiguity "sufficiently glaring to trigger" CJW to inquire before submitting a bid. *Certified Constr. Co.*, 15-1 BCA ¶ 36,068 at 176,132.

The Navy argues that even if the Board finds a latent ambiguity, FAR 52.236-21, SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FEB 1997) and DFARS 252.236-7001, CONTRACT DRAWINGS AND SPECIFCATIONS (AUG 2000), which are incorporated into the TO, resolve the ambiguity (gov't br. at 11-12). FAR 52.236-21 provides that information "shown on the drawings and not mentioned in the specifications[] shall be of like effect as if shown or mentioned in both" (finding 3). DFARS 252.235-7001 provides that "[o]missions from the drawings or specifications . . . that are manifestly necessary to carry out the intent of the drawings and specifications . . . shall not relieve the Contractor from performing such omitted or misdescribed details of the work" (finding 5). However, as CJW contends, these clauses are inapplicable here (app. reply at 15-17). There was no omitted detail for the hydronic pipe supports—as discussed above, CJW reasonably relied on detail 3 on Drawing M-502. Furthermore, the W6x15 steel I beams were not "manifestly necessary" as the only means of pipe support; in fact, the Navy's reasoning for rejecting the use of detail 3 was to accommodate its preference for building overhead clearance (finding 39). Accordingly, any defects in the

contract documents were latent and thus are to be construed against the Navy. *Metric Constructors*, 169 F.3d at 751.

## CONCLUSION

For the foregoing reasons, the appeal is sustained.

Dated:  January 23, 2023

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63228, Appeal of CJW Contractors Inc., rendered in conformance with the Board's Charter.

Dated:  January 23, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals